## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
## DURHAM DIVISION

| | |
|---|---|
| **IN RE:** | |
| **HAMPTON CAPITAL PARTNERS, LLC,** d/b/a **Gulistan Carpet,** | **CASE NO. 13-80015** **CHAPTER 11** |
| **DEBTOR** | |
| **AMENDED DISCLOSURE STATEMENT FOR THE SECOND AMENDED PLAN OF LIQUIDATION DATED OCTOBER 8, 2013** | |

Hampton Capital Partners, LLC, d/b/a Gulistan Carpet (the "Debtor"), provides the
following Amended Disclosure Statement regarding the Second Amended Plan of Liquidation
Dated October 8, 2013 (the "Plan") pursuant to 11 U.S.C. § 1125 and Rule 3016 of the Federal
Rules of Bankruptcy Procedure.  Capitalized terms are defined in the Plan and shall have the
meaning set forth therein.  **A copy of the Plan is attached as <u>Exhibit A</u> and is incorporated by
reference.**

<u>**INTRODUCTION**</u>

On January 7, 2013 (the "Petition Date"), the Debtor filed a voluntary petition in the
United States Bankruptcy Court for the Middle District of North Carolina (the "Court") seeking
relief under Chapter 11 of the Bankruptcy Code.  As of the Petition Date, the Debtor was in the
business of manufacturing and selling medium to high-end carpets under the Gulistan® brand
name to both residential and commercial markets.  The Debtor sold its carpets to customers
through independent retailers, franchises and leading home improvement retailers.

The Debtor retained Northen Blue, LLP as its counsel in connection with this bankruptcy
case, and retained Getzler Henrich & Associates LLC as financial consultant for the Debtor.  An
official committee of unsecured creditors (the "Committee") was appointed by the Court on
January 25, 2013.  The Committee retained Lowenstein Sandler LLP and Wilson and Ratledge,
PLLC as its counsel in connection with this bankruptcy case, and retained BDO Consulting, a
division of BDO USA, LLP as financial consultant for the Committee.

From the Petition Date through the date of the filing of the Plan, the Debtor has, among
other things, (i) completed the manufacture of carpet from raw materials and work in process on

hand on the Petition Date, and subsequently ceased all manufacturing operations, (ii) sold inventory and collected accounts receivable in the ordinary course of business, (iii) sold substantially all of its machinery and equipment, and (iv) sold its real property located in Aberdeen, NC. Not all assets have been liquidated as of this date, and the Debtor continues to collect accounts receivable and pursue the sale of the remaining parcel of real property located in Wagram, NC.

The Plan reflects the result of a negotiated agreement between (i) the Debtor, (ii) the Committee, (iii) Ronile Inc. ("Ronile"), the Debtor's parent entity and largest creditor, and (iv) the Ronile, Inc. Welfare Benefit Trust , the voluntary employees' beneficiary association (or "VEBA") in which the Debtor's employees participated. As a result of this negotiated agreement, and as more specifically described below and in the Plan, Ronile and the Ronile, Inc. Welfare Benefit Trust have agreed to subordinate the payment of their claims until the holders of allowed unsecured claims receive a 15% recovery on their claims, with the possibility of a further distribution from Avoidance Action Net Proceeds as set forth in the Plan.

The Plan proposes the appointment of a trustee to wind up the affairs of the Debtor, complete the final administration of the Debtor's bankruptcy estate, and consummate the Plan. All creditors and other parties in interest are encouraged to read the Plan carefully and thoroughly, and to review the Plan with their attorneys or other advisors to ascertain its terms, provisions, and conditions and the effect of the Plan on any Claims or Interests which such persons may possess.

## PROCEDURAL INFORMATION

Pursuant to the Bankruptcy Code, this Disclosure Statement must be approved by the Court before it can be submitted with the Plan to creditors or other parties in interest. Such approval is required by statute and does not constitute a determination by the Court as to the desirability of, or the value, adequacy, or suitability of any consideration offered under the Plan, but does indicate that the Disclosure Statement contains adequate information to permit those claimants and other parties in interest whose acceptance of the Plan is solicited pursuant to this Disclosure Statement to make an informed judgment about the Plan.

The Debtor prepared this Disclosure Statement to disclose the information available that is material, important and necessary to an evaluation of the Plan, and the material herein contained is intended solely for this purpose and the use of known creditors and interest holders

of the Debtor. This Disclosure Statement may not be relied upon for any purpose other than a determination of how to vote on the Plan. The Debtor as the proponent of the Plan supports the Plan for the reasons explained herein and encourages each creditor, interest holder, or other party in interest to accept the Plan by timely returning a ballot in favor of the Plan.

The Disclosure Statement is submitted in accordance with § 1125 for the purpose of soliciting acceptance of the Plan from holders of certain Classes of Claims and Interests. The persons whose acceptance is sought are those whose claims or interests are "impaired" by the Plan; *i.e.*--those whose claims or interests are altered by the Plan or who will not receive under the Plan the allowed amounts of their respective claims or interests in cash. Holders of those claims and interests which are not "impaired" are automatically deemed to have accepted the Plan.

If the Plan is rejected by one or more impaired classes of claims or interests, the Plan or a modification thereof may still be confirmed by the Court if the Court determines, among other things, that the Plan does not discriminate unfairly and is fair and equitable with respect to the rejecting class or classes of claims or interests impaired by the Plan. The Debtor will request such a determination (commonly referred to as a "cram down") if the Plan or modification thereof is not accepted by one or more of the impaired classes of claims or interests.

If the Plan or any modification thereof is not accepted by one or more of the impaired classes of claims or interests (not including a Class controlled by insiders of the Debtor) and is not confirmed by the Court pursuant to the cram down provisions of the Bankruptcy Code, the Debtor may seek to modify the Plan or to convert this case to a proceeding under Chapter 7, in which event a trustee would still liquidate all assets and pursue all necessary litigation. By separate Order served on all parties in interest, the Court will set deadlines to vote to accept or reject, or to object to the Plan, and set a date for the hearing to consider confirmation of the Plan.

A creditor or interest holder, in order to vote, must file a Proof of Claim or Interest on or before the date set as the "bar date" for filing all claims. The bar date for filing claims against the Debtor was May 12, 2012 (except for governmental units), which bar date has expired. However, any creditor or interest holder whose claim or interest is listed in the schedules filed by the Debtor and not identified as disputed, unliquidated or contingent is deemed (to the extent so scheduled) to have filed a claim, and absent objection such claim is deemed allowed and entitled to vote.

A creditor or interest holder may vote to accept or reject the Plan by filling out and mailing (as instructed thereon) the ballot which has been provided with this Disclosure Statement. The Court will set the time by which ballots must actually be filed; and, any ballots received after such time may not be counted. Regardless of whether a creditor or interest holder votes against the Plan, or whether the creditor or interest holder votes at all, such persons will be bound by the terms and treatment set forth in the Plan if the Plan is confirmed by the Court.

Allowance of a claim or interest for voting purposes does not necessarily mean that all or a portion of the claim or interest will be allowed or disallowed for distribution purposes. The Debtor or any party in interest may file an objection to a claim, which will then be allowed or disallowed by the Court after notice and an opportunity for hearing. Tax consequences of any of the transactions proposed by the Plan will depend upon the individual circumstances applicable to each creditor, interest holder, or other party in interest, and must of necessity include factors beyond the Debtor's knowledge. A general discussion of potential tax consequences is contained in the Disclosure Statement.

The various claims of creditors and interests of interest holders are all treated under the proposed Plan. There are additional significant provisions contained throughout the Plan that impact the treatment of creditors and interest holders--please read the Plan carefully to fully understand its terms. The Plan proposes segregation of the creditors into separate classes, with an additional class comprising the interests.

The Debtor or others may solicit your vote for or against the Plan. The cost of any solicitation by the Debtor will be borne by the Estate. No other additional compensation shall be received by any party for any solicitation other than as disclosed to the Court.

Certain materials contained in this Disclosure Statement may have been taken directly from other, readily accessible instruments or digests of other instruments. In addition, other information may be made available, upon reasonable written request, to creditors or other parties in interest having standing to request such information. While the Debtor has made every effort to retain the meaning of any such instruments or documents or the portions thereof reiterated herein, you are advised that any reliance on the contents of such other instruments or documents should be predicated on a thorough review of the instruments or documents themselves, including the Plan.

**Consummation of the Plan is subject to numerous conditions and variables, and there can be no assurance that the Plan, as contemplated, will be effectuated. No representations or assurances concerning the Plan are authorized by the Debtor other than as set forth in this disclosure statement. Any representations or inducements made by any person to secure your vote which are other than herein contained should not be relied upon by you in arriving at your decision, and such additional representations or inducements should be reported to Debtor's Counsel, who in turn shall convey such information to the Court for such action as may be deemed appropriate.**

<u>VOTING</u>

If you are in one of the classes of creditors or interest which are affected by the Plan, it is important that you vote. To vote to accept or reject the Plan, creditors and other persons or entities having claims against the Debtor falling within any of the impaired classes should indicate their acceptance or rejection on the appropriate ballot. Any persons holding claims in more than one impaired class must file one ballot for each such class. Additional ballots may be obtained by written request to Debtor's Counsel.

A class of claims will have accepted the Plan if it is accepted by class members holding at least two-thirds (2/3) in amount and more than one-half (½) in number of the allowed claims of such class voting on the Plan. A class of interests will have accepted the Plan if it is accepted by class members holding at least two-thirds (2/3) in amount of the allowed interests in such class voting on the Plan. You are, therefore, urged to fill in, date, sign, and promptly mail the enclosed ballot furnished to you.

**Please be sure to properly complete the form and legibly identify the name of the claimant or interest holder. Executed ballots must be received on or before the return date set forth in the ballot. Completed ballots should be returned to the address specified on the ballot. Since mail delays may occur, it is important that the ballot or ballots be mailed or delivered well in advance of the date specified. Any acceptances or rejections of the plan received after the date may not be included (unless otherwise permitted by the Court) in any calculation to determine whether the creditors and interest holders have voted to accept or reject the plan.**

**This is a solicitation by the Debtor only and is not a solicitation by the attorneys, accountants, or other professionals who may be employed by the Debtor, and the**

**representations made herein are solely and exclusively those of the Debtor and not of such attorneys, accountants, or other professionals.**

## BACKGROUND AND HISTORY OF THE DEBTOR

As of the Petition Date, the Debtor was in the business of manufacturing and selling medium to high-end carpets under the Gulistan® brand name to both residential and commercial markets. The Debtor sold its carpets to customers through independent retailers, franchises and leading home improvement retailers.

The Debtor's offices and primary manufacturing plant were located at 3140 NC 5 Highway, Aberdeen, NC 28315 (the "Aberdeen Facility"). The Debtor also had a secondary manufacturing location at 19320 Airport Road, Wagram, NC 28396, which was used primarily for the dying process in the Debtor's manufacturing operations (the "Wagram Facility").

Over the past five years, the Debtor incurred losses due primarily to the downturn in the real estate market and the corresponding decline in demand for its carpets. In 2009, the Debtor closed its manufacturing plant located in Turnersburg, NC (the "Turnersburg Facility") in an attempt to reduce its fixed costs and subsequently sold the facility. However, the closure and sale did not return the Debtor to profitability, and the continuing economic downturn and other factors resulted in its inability to pay its secured and unsecured debt in a timely fashion.

*Bank of America's Pre-Petition Secured Claim*

On the Petition Date, the Debtor's primary secured creditor was Bank of America, N.A. On August 28, 2003, the Debtor and Fleet Capital Corporation ("Fleet Capital") executed a certain Loan and Security Agreement, wherein Fleet Capital provided a credit facility to the Debtor in the total principal amount of $23.5 million, consisting of (i) a revolving loan not to exceed $15 million; (ii) a term loan in the original principal amount of $3.5 million; and (iii) a capital expenditure loan, up to an aggregate principal amount of $5 million. On August 28, 2003, the Debtor also executed (i) a Secured Promissory Note in the original principal amount of $3.5 million, (ii) a Master Capex Promissory Note in the original principal amount of $5 million, and (iii) a Secured Promissory Note in the original principal amount of $15 million, which was subsequently amended by a certain Amended and Restated Secured Promissory Note, dated May 19, 2004, in the principal amount of $18 million.

To secure these loans, on August 28, 2003, Fleet Capital filed (i) a North Carolina Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing in Moore County, NC,

which granted Fleet Capital a Lien on the Aberdeen Facility, and included an assignment of rents, (ii) a North Carolina Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing in Scotland County, NC, which granted Fleet Capital a Lien on the Wagram Facility, and included an assignment of rents, and (iii) a North Carolina Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing in Iredell County, NC, which granted Fleet Capital a Lien on the Turnersburg Facility, and included an assignment of rents. Additionally, on August 20, 2003, Fleet Capital filed a UCC-1 Financing Statement with the Virginia Secretary of State, perfecting a blanket Lien on the Debtor's present and future accounts, goods, inventory, equipment, general intangibles, deposit accounts, letter of credit rights, investment property, instruments, documents, chattel paper, and all products and proceeds of the foregoing.

On July 1, 2005, Fleet Capital and Bank of America, N.A. ("BofA") executed an Assignment and Assumption Agreement, pursuant to which Fleet Capital assigned to BofA its rights, title and interest in all of the loan documents and obligations described above, which together with all amendments and modifications are referred to herein as the "BofA Loan Documents." An assignment of the UCC-1 Financing Statement was filed with the Virginia Secretary of State on July 5, 2005, and continuation statements were filed on July 5, 2005 and January 12, 2010.

The Debtor defaulted on its obligations to BofA under the BofA Loan Documents, and on December 21, 2012, BofA sold some of its Collateral (certain yarn, work in process, product styles and samples used in connection with sales to Lowe's and other customers) to Masland Carpets, LLC ("Masland") pursuant to Section 9-610 of the Uniform Commercial Code. The purchase price paid by Masland to BofA for the property was $1,338,540 ("Masland Sale Proceeds"), which was applied to the outstanding indebtedness held by BofA. After application of the Masland Sale Proceeds, the aggregate amount owed to BofA under the BofA Loan Documents as of the Petition Date was $10,010,414, secured by a first priority Lien on the Debtor's real and personal property, subject only to ad valorem taxes which have a statutory priority under applicable law.

*Ronile, Inc.'s Pre-Petition Secured Claim*

On August 28, 2003, the Debtor also borrowed $7.5 million from Ronile, Inc. ("Ronile"), its majority owner at the time. The Debtor executed a Promissory Note dated August 28, 2003, in the original principal amount of $7.5 million. The Debtor also executed a Security Agreement

dated August 28, 2003, pursuant to which the Debtor granted Ronile a blanket Lien on all of the Debtor's accounts, inventory, furniture, fixtures and equipment, general intangibles, insurance proceeds, instruments, documents and chattel paper, and the proceeds thereof (the "Personal Property").[1] The Promissory Note provided that in addition to a blanket Lien on all such assets, the Aberdeen Facility, the Wagram Facility and the Turnersburg Facility would serve as collateral for the loan.

To secure these loans, on August 29, 2003, Ronile filed (i) a Credit Line Deed of Trust with the Moore County Register of Deeds, granting it a second priority Lien on the Aberdeen Facility, (ii) a Credit Line Deed of Trust with the Scotland County Register of Deeds, granting it a second priority Lien on the Wagram Facility, and (iii) upon information and belief, a UCC-1 Financing Statement with the Virginia Secretary of State with respect to the Personal Property.

Ronile's UCC-1 Financing Statement on the Personal Property lapsed when no continuation statement was filed, and a new Financing Statement was filed within 90 days prior to the Petition Date on December 31, 2012.

*Scotland County's Pre-Petition Secured Claim*

Scotland County holds a secured claim for outstanding ad valorem taxes on the Wagram Facility, which by statute is entitled to a first priority Lien on such real property. The amount of Scotland County's secured claim is approximately $36,400 plus interest and penalties as allowed by applicable law.

*Other Secured Claims*

Other parties asserting secured claims as of the Petition Date consisted of (i) Moore County, for ad valorem taxes on the Aberdeen Facility and the machinery and equipment located thereon, and (ii) Varilease Finance, Inc., with respect to an equipment lease converted to a purchase money security interest. Both of these secured claims were paid in full from the Net Sale Proceeds derived from the post-petition sale of the Aberdeen Facility and the machinery and equipment.

In addition, as of the Petition Date the Debtor was in possession of a Superba Heatsetter, ownership of which is claimed by Ronile. The equipment was sold post-petition and the Net Sale Proceeds in the amount of $75,000 are held in escrow pending a determination of the proper

---

[1] On August 28, 2003, Ronile and Fleet Capital executed a certain Intercreditor Agreement, pursuant to which Ronile agreed that its lien rights in the Debtor's property were subordinate to the lien rights of Fleet Capital.

recipient of such funds. The Plan proposes that one-half of such amount be remitted to Ronile and the other one-half be retained by the Estate for distribution pursuant to the Plan.

*Post-Petition Activities*

After the Petition Date, the Debtor obtained post-petition financing from Bank of America, in order to enable it to wind down and liquidate its assets in an orderly fashion, and maximize the recovery for the assets sold. The Court approved the post-petition financing facility pursuant to its Order (1) Authorizing Debtor-In-Possession to Obtain Interim Financing, Grant Security Interests and Accord Priority Status Pursuant to 11 U.S.C. §§ 361, 364(c), and 364(d); (2) Giving Notice of Final Hearing Pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2); and (3) Modifying Automatic Stay [Docket No. 39], and its Final Order (1) Authorizing Debtor-In-Possession to Obtain Financing, Grant Security Interests and Accord Priority Status Pursuant to 11 U.S.C. §§ 361, 364(c), and 364(d), and (2) Modifying Automatic Stay [Docket No. 132] (the "DIP Financing Order").

Pre-Petition, the Debtor and  INVISTA S.à r.l., INVISTA North America S.à r.l. and/or INVISTA Technologies S.à.r.l. (collectively, "INVISTA") entered into a Trademark License Agreement dated July 1, 2008 (replacing an earlier agreement of similar import), and an Amendment dated July 1, 2008 (collectively, with all subsequent amendments, the "Trademark Agreement"), pursuant to which INVISTA granted the Debtor a royalty-free license to use certain trademarks related to Stainmaster® carpet, which is a type of carpet manufactured using nylon sold by INVISTA. There was no royalty fee under the Trademark Agreement, but all of the yarn (i.e., the nylon) used to manufacture Stainmaster® branded carpet is sold exclusively by INVISTA. A substantial amount of the carpet manufactured and sold by the Debtor pre-petition was Stainmaster® branded carpet, and the Debtor purchased from INVISTA the yarn and chemicals necessary to manufacture such carpet. On December 20, 2012, INVISTA sent the Debtor a Notice of Termination, stating that the license to sell Stainmaster® branded carpet was being terminated effective immediately.

Shortly after the filing of the Petition, the Debtor instituted an adversary proceeding against INVISTA, asserting, *inter alia*, that INVISTA'S termination of the license was invalid and in violation of applicable law. INVISTA then filed its own adversary proceeding against the Debtor, seeking, *inter alia*, declaratory relief that the license had been properly terminated. INVISTA filed a motion seeking a preliminary injunction to enjoin the Debtor from selling its

carpet as Stainmaster® branded carpet. On February 12, 2013, the Court granted INVISTA's motion. As a result, the Debtor was prohibited from selling its carpet in the marketplace under the Stainmaster® brand, and was required to sell its carpet as generic carpet. On February 25, 2013, the Debtor and INVISTA settled their respective adversary proceedings. The settlement was supported by the Committee. Pursuant to the settlement and the Court's order approving the settlement, INVISTA was granted an allowed general unsecured claim in the amount of $2,750,000 – a reduction from the $9,115,733.98 in total claims that had been listed in the Debtor's schedules.

In the ordinary course of its business, the Debtor continued to manufacture carpet from the materials and work in process on hand as of the Petition Date until completed, and all manufacturing operations ceased prior to March 2013. The Debtor funded these activities with the revolving credit facility provided by Bank of America pursuant to the DIP Financing Order, and a substantial amount of Bank of America's pre-petition claim was paid down from the Debtor's sale of inventory and collection of accounts receivable post-petition.

On April 5, 2013, the Debtor filed a Motion To (A) Approve Sale Of Substantially All Machinery And Equipment, (B) Establish Related Sale Procedures, Including Break-up Fee, (C) Transfer Any And All Claims, Liens, Encumbrances And Interests In Sale Assets To Proceeds Of Sale, (D) Approve Form And Manner Of Notice Of Sale, And (E) Schedule Hearings [Docket No. 165] (the "Sale Motion"), pursuant to which the Debtor sought approval to sell substantially all of its machinery and equipment. On April 19, 2013, the Court entered an Order Approving (A) Form And Manner Of Notice, (B) Sale Procedures For The Debtor's Machinery And Equipment, Including Break-Up Fee, (C) Setting Deadlines For Bids And Objections, And (D) Scheduling Auction And Sale Hearing [Docket No. 192] (the "Sale Procedures Order"). On May 9, 2013, the Debtor conducted an auction pursuant to the Sale Motion and Sale Procedures Order. The highest and best bid at the auction was submitted by V.R.W. BVBA ("VRW"), in the amount of $5,800,000. On May 16, 2013, the Court entered an Order [Docket No. 243] approving the sale to VRW, and on May 17, 2013 the sale closed.

The proceeds from the sale of the machinery and equipment were disbursed pursuant to the Court's Order as follows: (i) $4,879,669 was disbursed to Bank of America to pay off substantially all of the remaining pre-petition and post-petition secured claims of Bank of America, (ii) $98,653 was disbursed to Varilease Finance, Inc. ("Varilease") to pay off the

entirety of the Varilease secured claim with respect to certain Muira boilers sold to VRW, (iii) $75,000 was set-aside and placed in the trust account of Debtor's Counsel, pending a determination as to the ownership of certain Superba Heatsetter equipment sold to VRW, (iv) $50,000 was paid to Gordon Brothers Commercial and Industrial, LLC and Counsel RB Capital, LLC as a break-up fee, and (v) the remaining net proceeds of $696,677 are now held by the Debtor to be disbursed pursuant to existing or future orders of the Court.

On May 1, 2013, the Debtor filed a motion [Docket No. 212] to approve the sale of its Aberdeen Facility to Lady Builders, LLC, or its assignee, for the sum of $1,750,000. On May 31, 2013, the Court entered an Order [Docket No. 260] approving the sale of the Aberdeen Facility. On June 28, 2013, the Debtor closed the sale of the Aberdeen Facility to Southern Pines Gaines LRK #36849, LLC, a wholly owned subsidiary of Lady Builders, LLC, and Net Sale Proceeds in the amount of $1,509,957 are now held by the Debtor to be disbursed pursuant to existing or future orders of the Court.

On June 10, 2013, the Debtor filed a motion [Docket No. 275] which sought to approve a certain Lien Release Agreement between the Debtor, the Official Committee of Unsecured Creditors, and Bank of America. That motion was granted by Order entered July 12, 2013 [Docket No. 306] and upon payment of legal fees or expenses owed pursuant to the post-petition financing agreement, the claims of Bank of America were fully paid and Bank of America's liens were fully released.

On June 28, 2013, the Debtor filed a motion [Docket No. 293] to approve the sale of its intellectual property assets and certain related assets to Alexandria International, Inc., for the sum of $100,000. On August 8, 2013, the Court entered an Order [Docket No. 312] approving the sale. On August 20, 2013, the sale closed, and the proceeds are now held by the Debtor to be disbursed pursuant to existing or future orders of the Court.

*Unliquidated Assets*

The Debtor has now completed the sale of its finished inventory in the ordinary course of its business. The Debtor has also continued to collect accounts receivable in the ordinary course of its business, and as of September 16, 2013 the accounts receivable outstanding had an estimated collection value of between $250,000 and $750,000 depending on the resolution of various disputes, claims for potential warranty setoffs, and costs of collection.

The Debtor still owns the Wagram Facility, a fee-owned improved parcel which is part of a larger building constructed on a surrounding parcel and owned by an unrelated third party. The value of the Wagram Facility is difficult to ascertain due in part to the unique relationship of this parcel to the much larger building of which it is a part. The Wagram Facility was valued in the Debtor's schedules at $470,000, but the actual value may range between $50,000 and $500,000.

## PLAN SUMMARY

**The following is a brief summary of certain provisions of the Plan and should not be relied on for voting purposes in lieu of a thorough and comprehensive review of the actual Plan itself. The summary does not purport to be complete. Creditors and interest holders are urged to read the Plan to ascertain the effect of the Plan on their claims and interests and the other provisions of the Plan. Creditors and interest holders are further urged to consult with their attorneys, tax advisors, financial consultants, or other professionals in order to understand more fully the Plan or the effect of the Plan as to their particular situation.**

The Plan reflects the result of a negotiated agreement between (i) the Debtor, (ii) the Committee, (iii) Ronile Inc. ("Ronile"), the Debtor's parent entity and largest creditor, and (iv) the Ronile, Inc. Welfare Benefit Trust, the voluntary employees' beneficiary association ("VEBA") in which the Debtor's employees participated. Confirmation of the Plan will, in effect, approve the compromise and settlement of various disputes regarding the secured and unsecured claims of Ronile and the Ronile, Inc. Welfare Benefit Trust and in turn, facilitate and enhance the distributions to creditors holding unsecured claims in this proceeding.

The Plan contemplates that the best disposition of the Debtor's estate would involve (i) the appointment of trustee on the Effective Date, who would have the powers and duties similar to a trustee appointed pursuant to § 1104 of the Bankruptcy Code, (ii) the sale and/or collection of any remaining property of the Estate, and (iii) the pursuit of certain Causes of Action or claims held by the Debtor's estate, or which the trustee could assert pursuant to §§ 502(d), 506(c), 541, 542, 543, 544, 546, 547, 548, 549, 550, 551, 552, or 553 of the Bankruptcy Code (the "Bankruptcy Causes of Action"). The cash and proceeds from these assets shall be distributed to creditors in accordance with the Plan. The Plan provides for the appointment of Phillip C. Essig as the liquidating or plan trustee. Mr. Essig, the CEO of the Debtor, is the

person most knowledgeable with the estate's remaining assets and best suited to implement the plan.

As of September 16, 2013, the Debtor had approximately $1,955,135.22 on hand from the liquidation of Personal Property (collection of accounts receivable, sale of inventory, sale of equipment, and sale of intellectual property) after payment of the BofA Secured Claim, the Varilease Secured Claim, the Moore County ad valorem taxes, and certain professional fees and operating costs. The Debtor is also holding approximately $1,510,495 in Net Sale Proceeds derived from the sale of its Aberdeen Facility which are subject to Ronile's secured claim. The Debtor estimates that additional funds realized from the collection on accounts receivable and sale of the Wagram Facility may total between $300,000 and $1,250,000.

The amount of additional funds available for distribution to creditors will vary depending upon the net proceeds actually realized from the remaining accounts receivable, and possibly the Wagram Facility, together with any recoveries on Bankruptcy Causes of Action or other litigation brought by the Trustee, less the costs of administering the estate.

The Debtor desires that this Plan be a consensual plan, with all classes of creditors voting to accept the Plan by the requisite majorities required under § 1126.  In the event any class does not accept the Plan, however, the Debtor requests that the Plan be confirmed by the cram down provisions of § 1129(b) with respect to such dissenting class or classes.  The Debtor reserves the right to modify the Plan pursuant to § 1127, consistent with the requirement that the Plan, as modified, meets the requirements of § 1122 and § 1123.

Prior to the filing of the Plan, the Debtor performed a thorough analysis of the potential Bankruptcy Causes of Action, including but not limited to preference actions under 11 U.S.C. § 547.  The Debtor determined that it had potential Bankruptcy Causes of Action against fourteen entities, who are specifically identified in sections 10.2.2.1 through 10.2.2.14 of the Plan. Pursuant to the Plan, the Trustee shall not pursue any Bankruptcy Causes of Action against any creditor or party other than those entities that are specifically identified therein.  The Debtor estimates that the aggregate amount of the Bankruptcy Causes of Action, after evaluating potential defenses, but before costs of litigation, is in the range of $400,000 to $670,000.

**Classification and Treatment of Claims and Interests.**

For purposes of the Plan, Claims and Interests are divided into the following Classes and will receive the treatment summarized below and set forth in detail in the Plan.  **A summary of**

**scheduled, filed and estimated claims is attached hereto as <u>Exhibit B</u>**. Please note that the schedule was prepared prior to completion of the claims reconciliation process, and thus the amounts shown are subject to change depending on the final amount of the allowed claims.

Prior to the filing of the Plan, the Debtor filed all objections to claims with respect to claims that it disputes, and under the Plan, all parties in interest shall file any claim objections prior to the Confirmation Date. Ronile, the Ronile, Inc. Welfare Benefit Trust, and the Trustee shall have no standing, authority or right to file or assert objections to claims. Notwithstanding the foregoing, the Trustee shall have standing, authority, and the right to object to any Claim or amendment to a Claim that is filed on or after September 23, 2013.

**<u>Administrative Claims.</u>** Claims for administrative expenses shall be allowed upon due request or application and in such amounts as may be determined by the Court after notice and hearing.

*<u>Professionals Retained By The Debtor Or The Committee.</u>*

The attorneys, accountants, financial consultants and other professionals retained by the Debtor or the Committee shall be reimbursed for actual, necessary expenses and compensated for services rendered in such capacity from the Petition Date to the Effective Date, and reasonably necessary to the administration of this estate, in such amounts as may be determined by the Court not to exceed reasonable compensation for such services. In addition, Members of the Committee shall be reimbursed for actual, necessary expenses incurred by a member of the Committee prior to the Effective Date, payable upon application filed in accordance with the Court's procedures and subject to approval by the Court.

From and after the Effective Date, the Debtor and the Committee shall no longer have any official capacity in this proceeding and only the Trustee may act on behalf of the Estate and employ professionals for the benefit and at the expense of the Estate.

*<u>The Trustee And Professionals Retained By The Trustee</u>*

The Trustee shall be reimbursed for actual, necessary expenses incurred and shall be entitled to reasonable compensation for services rendered in such capacity and reasonably necessary to the administration of this estate determined on an hourly or daily basis, not to exceed the limitations set forth in § 326, payable upon application filed in accordance with the Court's fee guidelines and procedures and subject to approval by the Court.

Attorneys, accountants and financial consultants retained by the Trustee may include Debtor's Counsel, Debtor's financial consultant, and such other attorneys, accountants or financial consultants as may be selected by the Trustee in the Trustee's sole discretion subject to approval by the Court. Attorneys, accountants or financial consultants retained by the Trustee shall be reimbursed for actual, necessary expenses incurred and shall be compensated for services rendered in such capacity from and after the Effective Date upon an hourly basis and at their customary hourly rates, payable upon application filed in accordance with the Court's fee guidelines and procedures and subject to approval by the Court. Notwithstanding the foregoing, the Trustee may also retain a professional on any other basis permitted under § 328, upon Notice and Hearing and subject to approval by the Court.

*Other Administrative Claims*

Pursuant to the Order Establishing Procedure to Determine Section 503(b)(9) Administrative Expenses [Docket No. 111], there have been certain Administrative Claims filed in the total amount of $68,979 for goods delivered within twenty days prior to the Petition Date pursuant to § 503(b)(9) of the Bankruptcy Code. As of the date of the filing of the Plan, no determination has been made regarding the allowance of these asserted claims. However, the Debtor has filed objections to certain claims filed pursuant to § 503(b)(9). Based upon its review, the Debtor anticipates that after accounting for claims that were late filed, for services rather than goods, and/or for goods that were provided outside of the twenty day period pre-petition, the total amount of allowed § 503(b)(9) administrative expense claims would be approximately $22,231 and the balance would be treated as Unsecured Claims. Additionally, pursuant to a certain consent order [Docket No. 241], The Dixie Group, Inc. has an allowed administrative expense claim of $44,178.65.

The Ohio Department of Taxation filed an "Administrative Expense Proof of Claim" in the claims register in this case, asserting an administrative expense claim of $10,000. The Debtor disputes this claim and has filed an objection to this claim.

*Payment Of Allowed Administrative Claims*

Allowed Administrative Expense Claims shall be paid on or before the later of (i) sixty (60) days after the Effective Date or (ii) thirty (30) days after the same can be determined and, if necessary, allowed by the Court.

The aggregate amount of Allowed Administrative Claims is difficult to predict, as the fees of the Debtor's and Committee's professionals (prior to the Effective Date) and the fees of the Trustee and the Trustee's professionals (after the Effective Date) will be directly related to the time and effort required in connection with confirmation of the Plan, liquidating the remaining assets of the estate, pursuing the Estate's Causes of Action (including Bankruptcy Causes of Action), and reconciling claims, which in turn will be related to the extent of the opposition and defenses raised by the parties involved. The fees and expenses of Debtor's Counsel, the Committee's counsel, and other professionals have been paid in part as and when allowed during the course of this case. The projections as summarized below represent an estimated amount for such claims which will be due and payable as provided above. These amounts are highly variable, and represent the Debtor's best estimate based on the amounts expended by professionals prior to the filing of the Plan.

The Court approved, on an interim basis, fees for the Debtor's Counsel of $93,203.00 and expenses of $7,391.70 for the period from the Petition Date through February 28, 2013, and fees of $94,642.00 and expenses of $2,321.69 for the period of March 1, 2013, through May 31, 2013, which fees and expenses have been fully paid. On September 16, 2013, Debtor's Counsel filed a third fee application covering the period of June 1, 2013 through August 31, 2013, requesting payment of $53,226.00 in fees and reimbursement of $1,640.41 in expenses. Those fees have not yet been approved for interim payment. Based on an estimated Effective Date of December 1, 2013, and fees and expenses already incurred in this case, the Debtor estimates that the Debtor's Counsel may incur additional fees and expenses of between $100,000 and $150,000 prior to the Effective Date.

The Court approved, on an interim basis, fees totaling $71,400.00 and expenses of $2,770.25 for the Debtor's financial consultant, Getzler Henrich & Associates, LLC, for the period from the Petition Date through February 28, 2013, which have been fully paid. On June 28, 2013, the Debtor's financial consultant filed a third and final fee application requesting additional fees of $2,240.00, covering the period through March 31, 2013. Given the liquidating nature of the case, the Debtor determined that a financial consultant was no longer necessary, and in order to maximize the return for the estate's creditors, the financial consultant has ceased all work on behalf of the Debtor's estate but remains available to assist the Trustee if and when requested.

The Court approved, on an interim basis, fees of $139,983.75 and expenses of $1,958.24, for counsel for the Committee, covering the period from January 30, 2013, through April 30, 2013, which fees and expenses have been paid.  Counsel for the Committee filed fee applications for the period of May 1, 2013 through July 31, 2013, requesting fees in the aggregate amount of $121,780.45 and expenses in the aggregate amount of $2,061.54. Based on an estimated Effective Date of December 1, 2013, and fees and expenses already incurred in this case, the Debtor estimates that the Committee's Counsel may incur additional fees and expenses of between $50,000 and $100,000 prior to the Effective Date.

The Court approved, on an interim basis, fees of $149,116.50, for the Committee's financial consultant, covering the period from February 1, 2013, through April 30, 2013, which fees and expenses have been paid.  The Committee's financial consultant filed a subsequent fee application for the period from May 1, 2013, through July 31, 2013, requesting $90,057.60 in fees and $101.08 in expenses.  Given the liquidating nature of this case, the Debtor does not believe significant future services from the Committee's financial consultant shall be necessary. Based on an estimated Effective Date of December 1, 2013, the Debtor estimates that the Committee's financial consultant may incur additional fees and expenses of between $20,000 and $30,000 prior to the Effective Date.

Pursuant to the DIP Financing Order, Debtor's Counsel and counsel for the Committee held certain amounts in reserve to secure the payment of professional fees. The reserve held in trust by the Committee's counsel has been fully expended.  Debtor's Counsel currently holds $11,004.50 in its trust account to secure payment of the fees and expenses of the Debtor's professionals.

Determining the administrative expenses for the Trustee and the Trustee's professionals is difficult, for the reasons stated above.  However, the Debtor has estimated the fees and expenses of the Trustee and the Trustee's professionals at between $200,000 and $400,000, which will vary depending on the cost of pursuing the Estate's Causes of Action and reconciling any Disputed Claims that have not been resolved prior to the Effective Date.  The Estate will also incur Court fees which have been estimated at between $10,000 and $13,000.00 depending on the actual distributions made by the Trustee.

**Priority Tax Claims**

Priority tax claims are those unsecured claims entitled to priority as set forth in §
507(a)(8) of the Bankruptcy Code. The proofs of claim scheduled and filed that assert Priority
Tax Claims (for sales and use taxes) total approximately $187,000; however, the Debtor believes
that the total allowed amount of such tax claims which will be approximately $34,423.

The Debtor is a limited liability company and thus does not have any income tax
obligations as the income (or loss) passes through to its members in the same manner as a
partnership.

Allowed Priority Tax Claims shall be paid, with interest at the applicable statutory rate
from the Effective Date, on or before the later of (i) sixty (60) days after the Effective Date or (ii)
thirty (30) days after the same can be determined and, if necessary, allowed by the Court.

**Classes of Claims**

**Class 1** (the "Ronile Secured Claims") shall consist of the following allowed secured
claims held by Ronile, Inc. ("Ronile"): (i) an allowed secured claim in the amount of $1,509,957
secured by the proceeds of the Aberdeen Facility (the "Ronile Secured-Aberdeen Claim"), and
(ii) an allowed secured claim in the amount of $500,000 secured by the Wagram Facility (the
"Ronile Secured-Wagram Claim").  Class 1 is impaired.

The Ronile Secured-Aberdeen Claim shall be allowed in the amount of $1,509,957 and
secured by a lien upon the Net Sale Proceeds of the Aberdeen Facility. The Ronile Secured-
Wagram Claim shall be allowed in the amount of $500,000 and secured by a lien upon the
Wagram Facility or the Net Sale Proceeds thereof. With the consent of Ronile, Ronile's asserted
Lien upon the Debtor's Personal Property or the proceeds thereof is deemed avoided and of no
further force or effect.

Payment of the Ronile Secured Claims, the Ronile Unsecured Claims and the VEBA
Claim shall be subordinated until after (i) payment in full of Allowed Administrative Expense
Claims, (ii) payment in full of Allowed Priority Claims other than the VEBA Claim, and (iii)
payment in an amount equal to 15% of Allowed Unsecured Claims other than the Ronile
Unsecured Claims (the "Unsecured Claims Distribution"). Upon payment of Administrative
Expense Claims, Priority Claims other than the VEBA Claim and the Unsecured Claims
Distribution as set forth above, the Net Sale Proceeds derived from the Aberdeen Facility shall
be disbursed to Ronile in satisfaction of the Ronile Secured-Aberdeen Claim.

The Wagram Facility shall be marketed for sale by the Trustee, subject to approval by the Court after Notice and Hearing, and Ronile shall reimburse the Estate for all costs or expenses of marketing, maintaining, insuring or preserving the Wagram Facility until the property is conveyed by the Estate. Upon payment of the Class 2 Secured Claim of Scotland County, Administrative Expense Claims, Priority Claims and the Unsecured Claims Distribution as set forth above, the Net Sale Proceeds derived from the Wagram Facility shall be disbursed to Ronile in full satisfaction of the Ronile Secured-Wagram Claim. Alternatively, upon the request of Ronile and in any event if the Wagram Facility has not been sold by the Trustee prior to filing the Final Report, the Wagram Facility shall be conveyed to Ronile subject to the Class 2 Secured Claim of Scotland County, in full satisfaction and as the indubitable equivalent of the Ronile Secured-Wagram Claim.

**Class 2** consists of the Secured Claim of Scotland County. Scotland County asserts a secured claim for ad valorem taxes in the amount of approximately $36,434, plus interest and penalties secured by a statutory lien upon the Wagram Facility. Scotland County shall retain its Lien on the Wagram Facility.

In the event of a sale of the Wagram Facility by the Trustee, the Class 2 Secured Claim shall be paid in full, with interest from the Petition Date at the applicable statutory rate, from the Net Sale Proceeds derived therefrom within thirty (30) days after the closing. Alternatively, in the event the Wagram Facility is conveyed to Ronile in satisfaction of the Ronile Secured-Wagram Claim, such conveyance shall be made subject to the Class 2 Secured Claim and Scotland County shall look solely to such property to satisfy its Secured Claim. Class 2 is not impaired and is conclusively deemed to have accepted the Plan.

**Class 3** shall consist of an Allowed Priority Claim pursuant to § 507(a)(5), held by the Ronile, Inc. Welfare Benefit Trust in the amount of $886,711 (the "VEBA Claim"). Class 3 is impaired.

Payment of the VEBA Claim shall be subordinated until after (i) payment of Allowed Administrative Expense Claims, (ii) payment of Allowed Priority Claims other than the VEBA Claim, and (iii) payment of the Unsecured Claims Distribution as provided in section 5.5.1 of the Plan. Subject to the foregoing subordination provisions, the VEBA Claim shall be paid (without interest) from Available Cash within sixty (60) days after the Effective Date.

Class 4 (the "Ronile Unsecured Claims") shall consist of the following allowed unsecured claims held by Ronile: (i) an allowed unsecured claim for administrative services and money loaned in the amount of $3,321,721 (the "Ronile Administrative Services Claim"), (ii) an allowed unsecured claim for money loaned in the aggregate amount of $5,150,000 (the "Ronile Unsecured Loan"), (iii) an allowed unsecured claim for goods sold on credit in the amount of $3,832,569 (the "Ronile Trade Claim"), and (iv) an allowed unsecured claim for the unsecured portion of the Ronile secured claims, in the amount of $10,000,000 (the "Ronile Deficiency Claim"). Class 4 is impaired.

Payment of the Ronile Unsecured Claims shall be subordinated until after (i) payment of Allowed Administrative Expense Claims, (ii) payment of Allowed Priority Claims other than the VEBA Claim, (iii) payment of the Unsecured Claims Distribution, and (iv) payment of the VEBA after payment of the Unsecured Claims Distribution pursuant to section 5.5.1 of the Plan. Subject to the foregoing subordination provisions, the Ronile Unsecured Claims shall be paid (i) an amount equal to 15% of the amount of the Ronile Unsecured Claims, (ii) an amount equal to 50% of the Avoidance Action Net Proceeds consistent with the provisions of section 5.5.1 of the Plan, and (iii) a pro rata share of the remaining Available Cash, pari passu with Class 5 Unsecured Claims, as and when determined by the Trustee in his reasonable discretion.

Class 5 shall consist of the Allowed Unsecured Claims other than the Ronile Unsecured Claims. Class 5 is impaired.

Holders of Class 5 Allowed Unsecured Claims shall receive and be paid a distribution of 15% of their Allowed Unsecured Claims as provided in section 5.5.1 of the Plan (the "Unsecured Claims Distribution") within 14 days after the Effective Date, subject to reserves for claim objections or Bankruptcy Causes of Action pending against a creditor, or within 14 days of when an Unsecured Claim is subsequently Allowed by Court order or agreement of the Creditor and the party objecting to their Claim. The prosecution of any Bankruptcy Causes of Action shall not delay the payment of the Unsecured Claims Distribution except as provided above with respect to reserves.

In addition, in the event that the Unsecured Claims Distribution is paid in full and estate funds remain, the remaining funds shall be distributed first to satisfy the Ronile Secured Claims in full, then to the Ronile, Inc. Welfare Benefit Trust until the VEBA Claim is satisfied in full, then to Ronile to pay up to 15% of the Class 4 Ronile Unsecured Claims. If any estate funds

remain following the initial distribution on account of the Class 4 Ronile Unsecured Claims up to 15%, then any such remaining funds shall be distributed *pro rata* to all of the holders of Allowed Unsecured Claims, including the Class 4 Ronile Unsecured Claims, until no estate funds remain.

The Trustee may prosecute the Bankruptcy Causes of Action permitted in section 10.2.2 of the Plan, and the Avoidance Action Net Proceeds shall be divided equally between (i) the holders of Class 5 Allowed Unsecured Claims, and (ii) Ronile. Also, in the event that the Debtor and/or the Trustee resolve any Bankruptcy Causes of Action without recovering a cash payment, but instead agree to accept the waiver, release or expungement of all or a portion of the unsecured claim of the defendant, then the economic value of such settlement to the Debtor's estate shall be divided equally between the holders of Class 5 Allowed Unsecured Claims and Ronile. By way of example, if a creditor holding a valid $100,000 Unsecured Claim agrees to waive its claim in exchange for the dismissal of an avoidance action against it, then before taking into consideration the transaction costs of such settlement, the value to the estate of such settlement is $15,000 on account of the 15% distribution that would have otherwise been made to such creditor had its claim been allowed in full. Such economic value will be divided equally between the holders of Class 5 Allowed Unsecured Claims and Ronile. The Trustee will pay the proceeds of such Bankruptcy Causes of Action in a second distribution to holders of Class 5 Allowed Unsecured Claims and to Ronile by no later than 30 days after the resolution of all Bankruptcy Causes of Action and objections to Unsecured Claims. Payments on account of the Avoidance Action Net Proceeds shall be paid to holders of Allowed Unsecured Claims regardless of how small the check might be.

**Class 6** shall consist of the Interests. The existing Interests shall be extinguished and holders of Interests shall receive no distribution pursuant to the Plan. All shareholder rights shall vest in the Trustee, and the holders of Interests shall have no further voting or control rights. Class 6 is impaired and is conclusively deemed to have rejected the Plan.

## PLAN CONSUMATION

### *Appointment of a Trustee.*

On the Effective Date, Phillip C. Essig shall be deemed appointed as the Trustee pursuant to § 1123 of the Bankruptcy Code. In the event the Trustee resigns, dies, becomes unable to serve in such capacity or is removed for cause after notice and hearing, the Bankruptcy Administrator shall appoint a successor trustee, subject to approval by the Court. The Trustee

shall wind up the affairs of the Debtor, complete the final administration of the bankruptcy case, and execute and consummate the Plan as set forth herein. The Debtor shall remain in existence, but all control and management rights with respect to the Debtor shall vest in the Trustee, in lieu of managers, officers, directors, or members. Upon entry of the Final Decree, the Trustee shall be discharged by the Court from further obligations and the Debtor's legal existence may be terminated under applicable state law. The Trustee shall be responsible for any filings required under any Federal, state and/or local law to file tax returns or tax reporting for the Debtor whether arising prior to the Petition Date, post-petition or after the entry of the Confirmation Order.

The Trustee will evaluate and pursue to the extent necessary, appropriate and warranted all Causes of Action by or on behalf of the Debtor. The Trustee may employ counsel, accountants, financial consultants or other professionals, including but not limited to the counsel employed by the Debtor, as the Trustee may determine to be in the best interest of the estate. Available Cash shall be distributed by the Trustee according to the order of priorities set forth in the Plan, after taking into account all prior distributions made since the Petition Date and appropriate reserves for administrative expenses and disputed claims.

*Property of the Estate*.

The Debtor has sold or stay relief has been granted with respect to most but not all of the Debtor's tangible and intangible assets pursuant to orders of the Court entered after Notice and Hearing. All remaining assets (including but not limited to, cash, funds on deposit, the Wagram Facility, accounts receivable, inventory, and Causes of Action) shall remain property of the Debtor's bankrupt estate and shall not re-vest in the Debtor.

*Distributions*.

Within fourteen (14) days after the Effective Date, Ronile will be paid from the Debtor counsel's trust account the sum of $37,500 in consideration of the sale of the Superba Heatsetter, which Ronile claims was its property and not property of the Debtor's estate. The remaining $37,500.00 will be transferred into the Debtor's unrestricted account for distribution in accordance with the Plan.

The Ronile Secured Claims shall be paid in the manner and as provided in section 5.1 of the Plan.

Available Cash will be distributed in payment of Allowed Administrative Expense Claims, Priority Tax Claims, the VEBA Claim, Ronile Unsecured Claims and Unsecured Claims in one or more distributions as provided in the Plan until paid in full.

Distributions to holders of Allowed Claims shall be made at the address of each such holder as set forth on the Schedules filed with the Bankruptcy Court unless superseded by the address as set forth on the proof of claim filed by such holders or other subsequent writing notifying the Debtor and/or Trustee of a change of address.

If any holder's distribution is returned as undeliverable, no further distributions to such holder shall be made unless and until the Trustee has been notified of such holder's then current address, at which time all missed distributions shall be made to such holder. All unclaimed distributions which exist as of the date of the final distribution to holders of Allowed Claims shall be paid over to the U.S. Treasury as provided in Section 347 and Bankruptcy Rule 3011 for unclaimed distributions as in a Chapter 7 proceeding.

Checks issued by the Trustee shall be null and void if not negotiated within sixty (60) days after the date of issuance thereof. Requests for re-issuance of any check shall be made to the Trustee by the holder of the Allowed Claim with respect to which such check originally was issued.

The Trustee may, but is not required to, in accordance with § 553 of the Bankruptcy Code and applicable non-bankruptcy law, set off or recoup against any Allowed Claim the distributions to be made pursuant to this Plan on account of such Claim (before any distribution is made on account of such Claim), the claims, rights and Causes of Action of any nature that the Trustee on behalf of the Estate, may possess against the holder of such Allowed Claim; provided, however, that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by the Trustee or the Estate of any such claims, rights and Causes of Action that they may possess against such holder; and provided further, that any claims by or on behalf of the Debtor arising before the Petition Date shall first be set off or recouped against Claims against the Debtor or the Estate arising before the Petition Date.

*Business Records Retention*

On and after the Effective Date, the Trustee shall maintain all of the Debtor's existing business records relevant and/or related to (i) unpaid accounts receivable, (ii) the business

relationship and transactions between the Debtor and the entities identified in sections 10.2.2.1 through 10.2.2.14 below, (iii) objections to claims that were filed by the Debtor, but still pending as of the Effective Date, (iv) any Causes of Action that may be brought by the Trustee pursuant to this Plan, (v) the Debtor's insolvency during the ninety day period pre-petition, and (vi) necessary for filing any Federal, state and/or local tax returns or tax reporting for the Debtor whether arising prior to the Petition Date, post-petition or after entry of the Confirmation Order. Additionally, the Trustee shall maintain all electronic records as can reasonably be maintained within the storage capacity of the Debtor's electronic server. With the exception of the foregoing, as of the Effective Date, the Trustee shall be authorized to destroy or dispose of the Debtor's business records in his reasonable discretion.

*Setoff Rights*

On or after the Effective Date, no right of setoff or recoupment may be asserted against the Debtor or its estate, unless such right has been properly preserved in a filed proof of claim.

*Substantial Consummation*.

The Plan shall be substantially consummated when the events specified in § 1101(2) of the Bankruptcy Code have occurred. Substantial consummation shall not occur until an order confirming the Plan (the "Confirmation Order") has become a Final Order; provided however, that if an appeal of the Confirmation Order is filed but no stay is granted in connection with such appeal, the Trustee may elect to proceed with consummation of the Plan.

*Estate's Causes of Action*

While the Debtor cannot predict the outcome of pending or potential Causes of Action, nor should the Debtor disclose possible litigation strategies or attorneys' work product, a brief summary of the pending or possible litigation for the Estate is provided below. Notwithstanding the Confirmation and Substantial Consummation of the Plan, the Trustee shall retain the right and standing to assert and shall have the sole and exclusive right to commence, pursue, settle, compromise, abandon, waive, or release any Cause of Action which may exist by or on behalf of the Debtor (including Bankruptcy Causes of Action) which accrued and were asserted or capable of assertion by the Debtor as a debtor-in-possession as of or after the Petition Date.

With the exception of the creditors listed in this sections 10.2.2.1 through 10.2.2.14 of the Plan, the Debtor and the Trustee shall not pursue any Bankruptcy Causes of Action against any

creditor or party and upon the Effective Date the right of any party (including the Trustee) to pursue any such Bankruptcy Causes of Action are and shall be deemed waived.

While every effort will be made to collect outstanding accounts without the time and expense of litigation, the Trustee may bring adversary proceedings in the Court, or civil actions in appropriate state or federal courts, to recover unpaid accounts receivable. The Trustee may also consider assigning the accounts to a third party for purposes of collection, or sell the accounts outright, subject to approval of the Court after Notice and Hearing.

*Executory Contracts and Leases:*

All executory contracts or leases which are existing on the Effective Date which have not been assumed or are not subject to a pending motion to assume are and shall be deemed rejected by the Debtor as of the Effective Date. To the extent the Debtor expects or is able to project potential rejection damage claims, such claims are included in the schedule of Unsecured Claims.

**FINANCIAL INFORMATION** The following information is available to creditors, interest holders, and other parties in interest:

*Monthly Reports.*

Monthly reports have been and shall continue to be filed by the Debtor through and including the Effective Date, and thereafter a post-confirmation report shall be filed by the Trustee on a quarterly basis until the filing of the Final Report. The Trustee shall file such reports by the end of the month next following the report period, and at the same time shall serve a copy thereon upon the Bankruptcy Administrator and any other party in interest making a written request.

*Financial Information on Record.*

At or shortly after the Petition Date, the Debtor filed Schedules of Assets and Liabilities and a Statement of Financial Affairs. The monthly reports, the Schedules of Assets and Liabilities, and the Statement of Financial Affairs may be inspected by interested parties in order to obtain a broader financial picture of the Debtor and the estate. These may be examined on-line through the Court's website.

**PLAN PROJECTIONS AND LIQUIDATION ANALYSIS**

The Projected Chapter 11 Recovery and Chapter 7 Liquidation Analysis attached to the Disclosure Statement as **Exhibit C** provides a summary of the expected distributions to creditors

under the Plan as well as a summary of the expected distributions to creditors if the case is converted to Chapter 7. Both the Projections and the Liquidation Analysis are subject to variance depending on (i) the net amounts realized from liquidation of the remaining assets and recoveries on the Estate's Causes of Action, (ii) the final determination of any unresolved claims objections, and (iii) the final amounts of the Allowed Administrative Claims, Priority Tax Claims, Priority Unsecured Wage and Benefit Claims, and Unsecured Claims.

While the projections in Exhibit C will necessarily evolve as assets are liquidated and claims are reconciled, the projections set forth the Debtor's estimate for the likely distributions to creditors in the manner required by the Bankruptcy Code. The primary assets of the Debtor's estate as of September 16, 2013, consist of the following: (i) funds on deposit in the aggregate amount of approximately $3,465,630.22, comprised of $1,955,135.22 in the Debtor's operating account, and $1,510,495 as the Net Sale Proceeds from the Aberdeen Facility, (ii) $11,004.50 held by Northen Blue as a reserve for the Debtor's professional fees pursuant to the DIP Financing Order, (iii) $75,000 held in escrow pending a determination as to the ownership of the Superba Heatsetter, (iv) the Wagram Facility with an estimated value of between $50,000 and $500,000, (v) accounts receivable with an estimated value of between $250,000 and $750,000, (vi) unused amounts of utility deposits made post-petition in an amount potentially ranging from $0 to $325,250, and (vii) potential recoveries on Causes of Action, including Bankruptcy Causes of Action, before costs of litigation, in the range of $400,000 to $670,000.

The Plan provides for the orderly liquidation of assets, pursuit of Causes of Action, and distribution to creditors in the order of priorities established by the Bankruptcy Code. Most of the Debtor's assets have already been liquidated, but the consummation of the Plan should result in a higher return for unsecured creditors versus what may be obtained if instead the case was converted to Chapter 7. First, pursuant to the negotiated agreement with the Committee, Ronile and the Ronile, Inc. Welfare Benefit Trust have agreed to subordinate the payment of their claims to ensure a dividend to general unsecured creditors of 15%. Second, the Debtor believes that the amount realized on accounts receivable will be substantially reduced if the case is converted, as the Trustee and the remaining key employees of the Debtor have knowledge of the accounts, the trade practices, and the potential defenses or setoffs which may be asserted by the account debtors. Without this assistance, a chapter 7 trustee would be ill-equipped to respond to claims of defects or warranty issues, and would more likely incur greater costs in collection

activities, resulting is an estimated decrease in recovery of approximately 20% or more. Third, the knowledge of Trustee and the remaining key employees will be extremely helpful in assisting with the Causes of Action to be brought on behalf of the estate.

In the event this case were converted to a case under Chapter 7, the Debtor believes that substantially the same actions would be taken by a trustee but with effective recoveries on the remaining assets of the estate, as well as some potential duplication of effort. More importantly, in the event the case were converted, the estate would lose the benefit of the agreement of Ronile and the Ronile, Inc. Welfare Benefit Trust to subordinate payment of their claims to ensure a 15% dividend to unsecured creditors. As shown on Exhibit C, the Debtor projects that the distribution to general unsecured creditors (excluding Ronile) under the Plan will be between 16.3% to 18.4%, as opposed to the estimated range of 3.41% to 6.3% that would be obtained if the case were converted to Chapter 7. Consequently, it is the Debtor's opinion that the best interests of all creditors, and especially the interests of creditors holding Unsecured Claims, are served through implementation and effectuation of the Plan. This assumes Ronile's Claims and the VEBA Claim as filed are allowed and no claim objections, lawsuits or lien challenges are successfully asserted against Ronile or the VEBA Claim.

## RECONCILIATION OF AND OBJECTIONS TO CLAIMS

The Debtor shall file all objections to Claims by no later than September 23, 2013, and any other party in interest (excluding Ronile and the Ronile, Inc. Welfare Benefit Trust) shall file other objections to claims prior to the Confirmation Date. Objections not filed within such periods, respectively, shall be deemed waived. Ronile, the Ronile, Inc. Welfare Benefit Trust and the Trustee shall have no standing, authority or right to file or assert objections to Claims. Notwithstanding the foregoing, the Trustee shall have standing, authority, and the right to object to (i) Claim No. 129 filed by WestPoint Home, LLC in the event the WestPoint Claim Settlement is not approved by the Court, and (ii) any Claim or amendment to a Claim that is filed on or after September 23, 2013. The absence of a filed objection, whether as to a scheduled or filed claim, prior to the deadline for voting to accept or reject the Plan shall not be deemed an acceptance of any Claim nor a waiver of the right to object to any Claim, and the holder of any such Claim shall not be entitled to assert reliance upon any implied acceptance of such Claim when voting to accept or reject the Plan.

If an objection to a Claim is not timely filed as required above, said Claim shall be allowed in the amount it was scheduled or filed, whichever is greater, except to the extent otherwise provided by the Plan with respect to the allowance of the Ronile Secured Claims, the VEBA Claim and the Ronile Unsecured Claims.

Confirmation of the Plan shall constitute allowance of the Ronile Secured Claims, the VEBA Claim and the Ronile Unsecured Claims as provided in sections 5.1, 5.3 and 5.4 of the Plan, respectively, and any pending objections to such claims shall be deemed overruled. Any other Claims asserted or filed by Ronile or the Ronile, Inc. Welfare Benefit Trust that are not expressly Allowed in the Plan shall be deemed disallowed and expunged and shall not be entitled to any distribution.

Any claim, or portion thereof, which is to be paid in cash under the Plan and which is challenged shall be protected by requiring the Trustee to segregate and set aside in an escrow account a reserve sufficient to treat said claim in the same fashion as though the objection were denied. The reserve so segregated shall be distributed in accordance with the Plan in the event the objection is overruled or a dispute is resolved in favor of the party asserting the claim. In the event the disputed claim is disallowed, the retained cash so segregated shall be available for distribution in accordance with the provisions of this Plan, with the disallowed claimant being excluded from the appropriate Class.

## TAX CONSEQUENCES OF THE PLAN

The federal income tax consequences of the Plan are complex and subject to significant uncertainties. The Debtor has not requested a ruling from the Internal Revenue Service ("IRS") or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to any interpretation that the IRS may adopt. In addition, this summary does not address foreign, state or local tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers. Furthermore, this discussion assumes that holders of Allowed Claims hold only Claims in a single Class. Holders of Allowed Claims in multiple Classes should consult their own tax advisors as to the effect such ownership may have on the federal income tax consequences described below.

The Debtor is a limited liability company which reports its taxable income or loss as part of the individual income tax returns filed by its members, and consequently, the Debtor or the Estate is not responsible for any income tax which may become due nor may the Debtor or the

Estate realize any tax benefits from any loss reportable for income tax purposes, whether for prior, current or prospective periods. To the extent any cancellation of debt ("COD") income is reportable as a result of consummation of the Plan, such COD income would flow through the Debtor or its Estate to the members.

Creditors holding Allowed Claims (whether Administrative, Priority, Secured or Unsecured) will receive cash payments as provided in the Plan over a variable period of time and in amounts which may result in less than full payment of the respective Allowed Claims. The extent to which the unpaid balance of the Allowed Claims (or any portion of the underlying claim which is asserted but is not allowed by the Court) can be deducted for income tax purposes by the holder of such claim, as well as the timing for recognition of revenues, gains or losses for income tax purposes, is dependent upon the particular creditor involved and cannot be addressed by the Debtor due to the multiplicity of factors which may be involved. The amount of the income or gain, and its character as ordinary income or capital gain or loss, as the case may be, will depend upon the nature of the claim of each particular Creditor.

The method of accounting utilized by a Creditor for federal income tax purposes may also affect the tax consequences of a distribution. In general, the amount of gain (or loss) recognized by any such Creditor will be the difference between (i) the Creditor's basis for federal income tax purposes, if any, in the Claim; and (ii) the amount of the distribution received. Whether the distribution will generate ordinary income or capital gain will depend upon whether the distribution is in payment of a Claim or an item which would otherwise generate ordinary income on the one hand or in payment of a Claim which would constitute a return of capital.

**PROVISIONS FOR IMPAIRED CREDITORS NOT ACCEPTING PLAN**

With respect to any Class of Claims impaired by and not accepting this Plan by the requisite majority in number and two-thirds (2/3) in dollar amount of those casting ballots, the Order confirming the Plan will fairly and equitably provide the requisite protection required by applicable provisions of the Bankruptcy Code.

With respect to the holders of Interests of the Debtor, the existing Interests shall be terminated and holders of Interests shall not receive any distributions pursuant to the Plan.

The Bankruptcy Code provides that the Plan may be confirmed even if it is not accepted by all impaired Classes. In order to be confirmed without the requisite number of acceptances of each impaired Class, the Court must find that at least one impaired Class has accepted the Plan

without regard to the acceptance of "insiders" (as that term is defined in the Bankruptcy Code) and the Plan does not discriminate unfairly against, and is otherwise fair and equitable to, such impaired Class. To the extent confirmation by "cramdown" is necessary or required, the Debtor requests confirmation thereof pursuant to § 1129(b) of the Bankruptcy Code without further motion or notice, which request shall be considered (if necessary) at the Confirmation Hearing.

## DISCHARGE AND RELEASE.

As the Plan provides for the liquidation of all assets of the Estate and the Debtor will not continue business operations, the Plan does not provide for the discharge of any claims or liabilities. However, all proceedings and court actions seeking to establish or enforce pre-petition liabilities and claims of any nature against property of the Estate or priorities received or retained by any creditor with respect to debts and obligations of the Debtor shall be stayed and treated as specifically provided for in the Plan.

## MATTERS TO CONSIDER BEFORE VOTING ON THE PLAN

### *Who May File a Plan.*

The confirmation of the Plan of Reorganization is the ultimate goal of the Chapter 11 proceeding. Consequently, your decision whether to accept or reject the Plan must be made in the context established by the Bankruptcy Code. In a Chapter 11 case, only the Debtor may file a plan of reorganization within the exclusivity period provided by §1121(b). At the request of the Debtor, the original exclusivity period was extended by the Court to July 8, 2013, and the Debtor filed its initial plan within such period, with the Plan being the first amendment to this initial plan.

### *What is Necessary for Court Approval of a Plan.*

Chapter 11 permits the adjustment of secured debt, unsecured debt and interests. A Chapter 11 Plan may provide for less than full satisfaction of senior indebtedness and payment of junior indebtedness, and may even provide some return to owners absent full satisfaction of indebtedness, so long as no impaired class votes against the Plan (except as provided below).

Even if an impaired class votes against the Plan, implementation of the Plan is still possible so long as (i) the Plan is fair and equitable and (ii) that class is afforded certain treatment defined by the Code, broadly defined as giving a claimant the full value of his claim or interest. Such value is determined by the Court and balanced against the treatment afforded the dissenting class of creditors.

In particular, senior claims must be satisfied in full prior to payment of junior claims or interests, unless the holders of senior claims agree to different treatment. This principle (commonly known as the "absolute priority rule") applies only in cases when a class of unsecured claims or interests is impaired and does not accept the proposed Plan. In that event, the absolute priority rule does not apply to all classes of unsecured claims and interests, but only to the dissenting class and classes junior to the dissenting class.

In the event a class is unimpaired, it is automatically deemed to have accepted the Plan. If there is no dissenting class, the test for confirmation (*i.e.*, approval) by the Court of a Chapter 11 Plan is whether the Plan is feasible and in the best interests of the creditors and interest holders. In simple terms, this test requires that creditors and interest holders receive more under the Plan than they would obtain if the Debtor were liquidated and the proceeds distributed in accordance with bankruptcy liquidation priorities. The Court, in considering this factor, need not consider any other alternatives to the Plan but liquidation.

In considering "feasibility" the Court is only required to determine whether the Plan can be accomplished. This entails determining the availability of cash for payments required at the Effective Date, and any other factor which might make it impossible for the Debtor to accomplish that which it proposes to accomplish in the Plan. In addition, in order to confirm a Plan the Court must find that such Plan was proposed in good faith and that the Plan and the Debtor are in compliance with the applicable provisions of Chapter 11. Finally, similar to the requirement that the Court find the Plan to be feasible, the Court must find that liquidation or further reorganization is not likely to occur after implementation of the Plan, except to the extent the Plan provides for such liquidation.

The determination by the Court that the Plan is fair, equitable and feasible occurs at the confirmation hearing. The Court's adjudication of these matters does not constitute an expression of the Court's opinion as to whether the Plan is a good one, nor does it constitute an opinion by the Court regarding any debt or interest or securities issued to creditors under the Plan.

*Alternatives to the Plan.*

Although this Disclosure Statement is intended to provide information to assist in the formation of a judgment as to whether to vote for or against the Plan, and although creditors are not being offered, through that vote, an opportunity to express an opinion concerning alternatives

to the Plan, there are no on-going operations and the only likely alternative to the Plan is the liquidation of the Debtor through conversion of the case to one under Chapter 7 which would result in the appointment of a Chapter 7 trustee, a new notice period for the filing of claims, and additional administrative costs, and any dividend to unsecured creditors would be delayed and likely reduced in some amount.

**While there may be one or more possible alternatives to the proposed Plan, a vote must be for or against the Plan and not a vote on the likely alternatives to the Plan.  If you believe the alternatives are preferable to the Plan and you wish to urge them upon the Court, you should consult counsel as to the appropriate response.**

_Specific Considerations in Voting_.

While the Plan provides for certain payments or other distributions, such payments or distributions will only be made to the holders of Allowed Claims.  Under the Bankruptcy Code, a claim may not be paid until it is "allowed" pursuant to §502.  A filed or scheduled claim will be allowed in the absence of an objection.  A claim to which an objection has been filed will be heard by the Court at a regular evidentiary hearing and will be allowed in full or in part or disallowed.  Under the Plan, payment on certain claims may be delayed until all pending objections to such claims, or Bankruptcy Causes of Action asserted against the creditors holding such claims, are ultimately adjudicated or settled.

For Classes of Claims which do not receive payment in full on the Effective Date, there are certain risks inherent in accepting the Plan, including the absence of absolute certainty of payment in any particular amount, especially with respect to Unsecured Claims.

The materials provided in this Disclosure Statement are intended to assist you in voting on the Plan in an informed fashion. If the Plan is confirmed, you will be bound by its terms; therefore, you are urged to review this material and to make such further inquiries as you may deem appropriate, then cast an informed vote on the Plan. The Debtor solicits your acceptance of the Plan as being in the best interests of creditors in this case.

RESPECTFULLY submitted, this the 8th day of October, 2013.

/s/ Phillip Essig, on behalf of Hampton Capital Partners, LLC
/s/John A. Northen, counsel for Hampton Capital Partners, LLC

**Counsel for the Debtor:**
John A. Northen, NCSB #6789
jan@nbfirm.com
Vicki L. Parrott, NCSB #25449
vlp@nbfirm.com
John Paul H. Cournoyer, NCSB #42224
jpc@nbfirm.com
Northen Blue, LLP
Post Office Box 2208
Chapel Hill, NC 27515-2208
Telephone: 919-968-4441


**Exhibits to Disclosure Statement:**

A.      Plan of Liquidation Dated October 8, 2013.

B.      Summary of Scheduled, Filed and Estimated Claims, By Class.

C.      Projected Chapter 11 Recovery and Chapter 7 Liquidation Analysis

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
DURHAM DIVISION**

| | |
|---|---|
| **IN RE:** | |
| **HAMPTON CAPITAL PARTNERS, LLC, d/b/a Gulistan Carpet,** | **CASE NO. 13-80015 CHAPTER 11** |
| **DEBTOR** | |
| **SECOND AMENDED PLAN OF LIQUIDATION DATED OCTOBER 8, 2013** | |

NOW COMES Hampton Capital Partners, LLC, d/b/a Gulistan Carpet (the "Debtor"), pursuant to 11 U.S.C. § 1129 and Rule 3016 of the Federal Rules of Bankruptcy Procedure, and respectfully proposes the following Second Amended Plan of Liquidation Dated October 8, 2013 (the "Plan").

1. **INTRODUCTION.**   On January 7, 2013 (the "Petition Date"), the Debtor filed a voluntary petition seeking relief under Chapter 11 of the Bankruptcy Code and an Order for relief was entered.

    1.1.        As of the Petition Date, the Debtor was in the business of manufacturing and selling medium to high-end carpets under the Gulistan® brand name to both residential and commercial markets.  The Debtor sold its carpets to customers directly and through independent retailers, franchises and leading home improvement retailers.

    1.2.        The Debtor retained Northen Blue, LLP ("Debtor's Counsel") as its counsel in connection with this bankruptcy case, and retained Getzler Henrich & Associates LLC ("Getzler Henrich") as financial consultant for the Debtor.

    1.3.        An official committee of unsecured creditors (the "Committee") was appointed by the Court on January 25, 2013, and the Committee retained Lowenstein Sandler LLP and Wilson and Ratledge, PLLC (together, "Committee's Counsel") as its counsel in connection with this bankruptcy case, and retained BDO Consulting, a division of BDO USA, LLP ("BDO") as financial consultant for the Committee.

    1.4.        The Plan reflects the result of a negotiated agreement between (i) the Debtor, (ii) the Committee, (iii) Ronile Inc. ("Ronile"), the Debtor's parent entity and largest creditor, and (iv) the Ronile, Inc. Welfare Benefit Trust (the "VEBA"), the voluntary

employees' beneficiary association in which the Debtor's employees participated. Confirmation of the Plan will, in effect, approve the compromise and settlement of various disputes regarding the secured and unsecured claims of Ronile and the VEBA and in turn, facilitate and enhance the distributions to creditors holding unsecured claims in this proceeding.

**1.5.** The Plan governs the liquidation of the Debtor's assets, treatment of executory contracts and leases, reconciliation of claims, review and pursuit of certain causes of action, and distributions to creditors, among various other matters. The Plan proposes the appointment of a trustee to wind up the affairs of the Debtor, complete the final administration of the Debtor's bankruptcy estate, and execute and consummate the Plan.

**1.6.** Reference is made to the Amended Disclosure Statement for the Second Amended Plan of Liquidation Dated October 8, 2013 (the "Disclosure Statement") for a brief discussion of the Debtor's history, business, results of operations, historical financial information and properties, the results of the Debtor's liquidation of assets to date, and an analysis of the Plan. All creditors entitled to vote on the Plan should review the Disclosure Statement before voting to accept or reject the Plan. In addition, there may be other agreements and documents that have been filed which are referenced in the Plan and/or the Disclosure Statement and which are available for review. No solicitation materials, other than the Disclosure Statement, have been authorized by the Court for use in soliciting acceptances or rejections of the Plan.

**2. <u>DEFINITIONS.</u>** For purposes of this Plan and accompanying Disclosure Statement, the following definitions shall apply and, unless otherwise indicated, the singular shall include the plural:

**2.1.** <u>Aberdeen Facility</u>: The Debtor's offices and primary manufacturing plant were located at 3140 NC 5 Highway, Aberdeen, NC 28315.

**2.2.** <u>Administrative Expense Claim</u>: The costs and expenses of administration of this case allowed under § 503(b) of the Bankruptcy Code that are entitled to priority under § 507(a)(2) of the Bankruptcy Code, including, without limitation, the actual, necessary costs and expenses of preserving the Debtor's estate and liquidating the Debtor's remaining assets, interim and final compensation for the Trustee, interim and final fees and expenses of professional persons employed by the Trustee, the Debtor, and the Committee, and other

costs and expenses necessary to the administration of the estates and the liquidation of the remaining assets or otherwise allowed as administrative expenses by Order of the Court, including claims allowed under section 503(b)(9) of the Bankruptcy Code.

**2.3.** <u>Allowed Claim or Interest</u>:  Any claim against or interest in the Debtor (a) for which a proof of claim was filed on or before the date designated by the Court as the last day on which to file such proofs of claim in this proceeding, or (b) which is listed in the Schedules filed by the Debtor (unless listed as unliquidated, disputed or contingent) and, in either case, to which (i) no objection has been filed within the applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, or Order of this Court, or (ii) an objection has been timely filed and determined by Final Order, and then only to the extent the Order allows such claim.

**2.4.** <u>Available Cash</u>:  All proceeds recovered or generated from the liquidation of assets, Causes of Action (including Bankruptcy Causes of Action), or from any other sources, less payment or provisions for Allowed Secured Claims having a Lien upon such assets.

**2.5.** <u>Avoidance Action Net Proceeds</u>: The net proceeds realized by the Estate as a result of Bankruptcy Causes of Action threatened or commenced (meaning gross recoveries collected, less actual costs of collection including reasonable attorneys' fees). In the event that the Debtor and/or Trustee resolve any Bankruptcy Causes of Action without recovering a cash payment, but instead agree to accept the waiver, release or expungement of all or a portion of an unsecured claim of the defendant, then the economic value of such settlement to the Debtor shall be determined as set forth in section 5.5.1.

**2.6.** <u>Bankruptcy Administrator</u>:  The United States Bankruptcy Administrator for the Middle District of North Carolina.

**2.7.** <u>Bankruptcy Causes of Action</u>:  Any claim or cause of action which may be asserted by a trustee or a debtor-in-possession under Sections 502(d), 506(c), 541, 542, 543, 544, 546, 547, 548, 549, 550, 551, 552, or 553 of the Bankruptcy Code.

**2.8.** <u>Bankruptcy Code</u>:  Provisions of Title 11, United States Code, as amended from time to time and applicable to this case.  References to "§____" shall refer to a section of the Bankruptcy Code unless otherwise specified.

2.9.     Bankruptcy Rules:  The Federal Rules of Bankruptcy Procedure, as amended from time to time and applicable to this case.

2.10.     Causes of Action:  Limited to any lawsuits or claims to collect pre- and post-petition receivables due to the Debtor and Bankruptcy Causes of Action.

2.11.     Claim:  Any right to payment, or any right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, as defined in section 101(5) of the Bankruptcy Code.

2.12.     Claims Bar Date:  The date by which a proof of claim must be filed with the Court, which shall be, as applicable, (i) May 12, 2013 with respect to all creditors except a governmental unit, (ii) 180 days after the Order for Relief (July 6, 2013) with respect to a governmental unit, and (iii) thirty (30) days after the Confirmation Date, or such other (whether earlier or later) deadline as may be set by the Court with respect to claims arising from the rejection of any lease or executory contract.

2.13.     Class:  A group of Claims or Interests which are substantially similar to each other, as classified under the Plan.

2.14.     Collateral:  Property of the Debtor which has been duly and properly pledged to a creditor to secure indebtedness, and which pledge (of whatever nature) has not been avoided or subordinated.

2.15.     Committee:  The Official Committee of Unsecured Creditors pursuant to the Order Appointing Committee of Unsecured Creditors in a Chapter 11 Reorganization entered January 25, 2013.

2.16.     Confirmation Date:  The date on which the clerk enters on the Court's docket the Confirmation Order confirming the Plan.

2.17.     Confirmation Order:  The Order of the Court confirming the Plan pursuant to § 1129 of the Bankruptcy Code.

2.18.     Court:  The United States Bankruptcy Court for the Middle District of North Carolina, and any appellate court that exercises jurisdiction over this case.

2.19.     Debtor: Hampton Capital Partners, LLC.

2.20.     Disputed Claim:  Any Claim which is not an Allowed Claim and with respect to which (i) an objection has been interposed and has not been resolved by agreement

or Final Order, (ii) the Debtor has scheduled as disputed, contingent or unliquidated, or (iii) the claim is set forth in an improper proof of claim or a proof of claim untimely filed.

**2.21.**      Distribution Date:  Any date on which distributions are to be made to creditors pursuant to terms and provisions of this Plan or upon approval of this Court.

**2.22.**      Effective Date:  The fifteenth day next following the Confirmation Date, or such earlier or later date as may be set forth in the Confirmation Order, provided that the Confirmation Order has not been stayed, reversed, or amended as of such day.

**2.23.**      Escrow Account:  Any escrow account established for the purpose of collecting, maintaining, accounting and reporting for all proceeds from the liquidation of assets, to be received and disbursed pursuant to the terms of this Plan or further Orders of the Court.

**2.24.**      Estate:  The property belonging to the Debtor on the date this case was commenced and as defined by § 541 of the Bankruptcy Code and other applicable law.

**2.25.**      Final Consummation:  The consummation of all things contained in or provided for in this Plan, and the entry of a Final Decree finally dismissing this bankruptcy case.

**2.26.**      Final Decree:  The final decree entered by the Court pursuant to Bankruptcy Rule 3022.

**2.27.**      Final Order:  An order (i) as to which the time to appeal or seek review or rehearing has expired and as to which no motion or petition for review or rehearing is pending, or (ii) if an appeal, motion or petition for review or rehearing is pending, the operation or effect of which order has not been stayed, reversed, or amended.

**2.28.**      Final Report:  A report to be filed with the Court upon and after completion of all acts required to achieve Final Consummation of the Plan, which report shall include, but not be limited to, all information necessary to meet the reporting requirements of the Court, the Bankruptcy Administrator, and the Plan.

**2.29.**      Interest:  Any membership or other equity interest in the Debtor.

**2.30.**      Lien:  A mortgage, judgment lien, materialman's lien, statutory lien, security interest, pledge, charging order, or other encumbrance on the Debtor's property, effective under applicable laws as of the Petition Date or thereafter as authorized by Order of the Court to secure payment of a debt or performance of an obligation.

**2.31.**  Net Sale Proceeds: The proceeds derived from the sale of any tangible or intangible property of the Estate, after payment or provision for direct costs of sale.

**2.32.**  Notice and Hearing:  Notice and hearing as defined by § 102 of the Bankruptcy Code.

**2.33.**  Personal Property:  The Debtor's cash, accounts, inventory, furniture, fixtures and equipment, general intangibles, insurance proceeds, instruments, documents and chattel paper, and the proceeds thereof.

**2.34.**  Petition Date:  January 7, 2013, the date the petition was filed in this proceeding seeking relief pursuant to Chapter 11 of the Bankruptcy Code..

**2.35.**  Plan:  This Second Amended Plan of Liquidation and any modification thereof made by the Debtor as provided herein.

**2.36.**  Priority Claim:  An allowed claim that is unsecured and is entitled to priority under § 507 or § 364 of the Bankruptcy Code, excluding Priority Tax Claims.

**2.37.**  Priority Tax Claim:  An allowed claim for federal, state or local (county or city) taxes that is unsecured and is entitled to priority under § 507 or § 364 of the Bankruptcy Code.

**2.38.**  Pro Rata:  The proportion that each allowed claim in a particular Class of Claims or Interests bears to the aggregate of all allowed Claims or Interests in that Class on the relevant date.

**2.39.**  Secured Claim:  An allowed claim that is secured by a Lien which has not been avoided, to the extent of the value of the Collateral subject to such Lien as determined under § 506 of the Bankruptcy Code.

**2.40.**  Subordinated Claim:  A Claim the payment of which has been subordinated by agreement of the holder of such Claim or an Order of the Court to the payment of other Allowed Claims.

**2.41.**  Substantial Consummation:  The date on which the Debtor has substantially completed all requirements of this Plan, as determined in accordance with § 1101(2) of the Bankruptcy Code or, if applicable, entry of an Order of Substantial Consummation by this Court.

**2.42.**  Trustee:  Phillip C. Essig, or his successor if applicable.

**2.43.** <u>Unsecured Claim</u>: An allowed claim that is unsecured and is not entitled to be treated as an Administrative Expense Claim, a Priority Claim or a Priority Tax Claim.

**2.44.** <u>VEBA Claim</u>: The Priority Claim asserted by the Ronile, Inc. Welfare Benefit Trust in the amount of $886,711, as stated in Claim No. 124.

**2.45.** <u>Wagram Facility</u>: The Debtor's secondary manufacturing location at 19320 Airport Road, Wagram, NC 28396, which was used primarily for the dying process in the Debtor's manufacturing operations.

**2.46.** <u>WestPoint Claim Settlement</u>**:** The compromise and settlement of the Unsecured Claim asserted by WestPoint Home, LLC in Claim No. 129, as set forth in the Motion (Dkt. No. 346) filed by the Debtor on September 19, 2013.

**3. <u>ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY TAX CLAIMS.</u>**

**3.1.** Administrative Expense Claims shall be allowed upon due request or application and in such amounts as may be determined by the Court after Notice and Hearing, subject to the following limitations and provisions as to payment.

**3.1.1.** Attorneys and financial consultants retained by the Debtor or the Committee shall be compensated for services rendered in such capacity from their respective dates of their employment through the Effective Date upon an hourly basis and at their customary hourly rates, and reimbursed for actual, necessary expenses incurred, payable upon application filed in accordance with the Court's fee guidelines and procedures and subject to approval by the Court.

**3.1.2.** Members of the Committee shall be reimbursed for actual, necessary expenses incurred by a member of the Committee prior to the Effective Date, payable upon application filed in accordance with the Court's procedures and subject to approval by the Court. Upon the Effective Date, the Committee shall no longer have any official capacity in this proceeding.

**3.1.3.** The Trustee shall be reimbursed for actual, necessary expenses incurred and shall be entitled to reasonable compensation for services rendered in such capacity and reasonably necessary to the administration of this estate determined on an hourly or daily basis, not to exceed the limitations set forth in § 326, payable upon application filed in accordance with the Court's fee guidelines and procedures and subject to approval by the Court.

**3.1.4.**   Attorneys, accountants and financial consultants retained by the Trustee may include Debtor's Counsel, Debtor's financial consultant, and such other attorneys, accountants or financial consultants as may be selected by the Trustee in the Trustee's sole discretion subject to approval by the Court. Attorneys, accountants or financial consultants retained by the Trustee shall be reimbursed for actual, necessary expenses incurred and shall be compensated for services rendered in such capacity from and after the Effective Date upon an hourly basis and at their customary hourly rates, payable upon application filed in accordance with the Court's fee guidelines and procedures and subject to approval by the Court. Notwithstanding the foregoing, the Trustee may also retain a professional on any other basis permitted under § 328, upon Notice and Hearing and subject to approval by the Court.

**3.1.5.**   Claims filed pursuant to the "Order Establishing Procedure to Determine Section 503(b)(9) Administrative Expenses" [Docket No. 111], for goods delivered within twenty days prior to the Petition Date, shall be determined by the Court after Notice and Hearing, with any such objections filed by the Debtor by no later than September 23, 2013.  The Trustee, Ronile, Inc., and the Ronile, Inc. Welfare Benefit Trust shall have no standing to object to § 503(b)(9) Administrative Expenses.

**3.1.6.**   Allowed Administrative Expense Claims shall be paid on or before the later of (i) sixty (60) days after the Effective Date or (ii) thirty (30) days after the same can be determined and, if necessary, allowed by the Court.

**3.2.**         Allowed Priority Tax Claims shall be paid, with interest at the applicable statutory rate from the Effective Date, on or before the later of (i) sixty (60) days after the Effective Date or (ii) thirty (30) days after the same can be determined and, if necessary, allowed by the Court.

**4.   DESIGNATION OF CLASSES OF CLAIMS AND INTERESTS.**         For purposes of the Plan, Claims and Equity Interests are classified as follows:

**4.1.**         **Class 1** (the "Ronile Secured Claims") shall consist of the following Allowed Secured Claims held by Ronile, Inc. ("Ronile"):

**4.1.1.**   An Allowed Secured Claim in the amount of $1,509,957 secured by the proceeds of the Aberdeen Facility (the "Ronile Secured-Aberdeen Claim").

**4.1.2.** An Allowed Secured Claim in the amount of $500,000 secured by the Wagram Facility (the "Ronile Secured-Wagram Claim").

**4.2.** **Class 2** shall consist of the Secured Claim of Scotland County for ad valorem taxes, interest and penalties secured by a Lien upon the Wagram Facility.

**4.3.** **Class 3** shall consist of an Allowed Priority Claim pursuant to § 507(a)(5), held by the Ronile, Inc. Welfare Benefit Trust in the amount of $886,711 (the "VEBA Claim").

**4.4.** **Class 4** shall consist of the Allowed Unsecured Claims held by Ronile (the "Ronile Unsecured Claims") as follows:

**4.4.1.** An Allowed Unsecured Claim for administrative services and money loaned in the amount of $3,321,721 (the "Ronile Administrative Services Claim").

**4.4.2.** An Allowed Unsecured Claim for money loaned in the aggregate amount of $5,150,000 (the "Ronile Unsecured Loan").

**4.4.3.** An Allowed Unsecured Claim for goods sold on credit in the amount of $3,832,569 (the "Ronile Trade Claim").

**4.4.4.** An Allowed Unsecured Claim for the unsecured portion of the Ronile secured claims in the amount of $10,000,000 (the "Ronile Deficiency Claim").

**4.5.** **Class 5** shall consist of the Allowed Unsecured Claims other than the Class 4 Ronile Unsecured Claims.

**4.6.** **Class 6** shall consist of the Interests.

**5.** **TREATMENT OF CLASSES IMPAIRED UNDER THE PLAN.** Claims and Interests shall receive the following treatment under the Plan:

**5.1.** **Class 1: Ronile Secured Claims.**

**5.1.1.** The Ronile Secured-Aberdeen Claim shall be allowed in the amount of $1,509,957 and secured by a lien upon the Net Sale Proceeds of the Aberdeen Facility.

**5.1.2.** The Ronile Secured-Wagram Claim shall be allowed in the amount of $500,000 and secured by a lien upon the Wagram Facility or the Net Sale Proceeds thereof.

**5.1.3.** With the consent of Ronile, Ronile's asserted Lien upon the Debtor's Personal Property or the proceeds thereof is deemed avoided and of no further force or effect.

**5.1.4.** Payment of the Ronile Secured Claims, the Ronile Unsecured Claims and the VEBA Claim shall be subordinated until after (i) payment in full of Allowed Administrative Expense Claims, (ii) payment in full of Allowed Priority Claims other than the VEBA Claim, and (iii) payment in an amount equal to 15% of the Class 5 Allowed Unsecured Claims as provided in section 5.5.1 (the "Unsecured Claims Distribution").

**5.1.5.** Upon payment of Administrative Expense Claims, Priority Claims other than the VEBA Claim, and the Unsecured Claims Distribution as provided in section 5.5.1, the Net Sale Proceeds derived from the Aberdeen Facility shall be disbursed to Ronile in satisfaction of the Ronile Secured-Aberdeen Claim.

**5.1.6.** The Wagram Facility shall be marketed for sale by the Trustee, subject to approval by the Court after Notice and Hearing, and Ronile shall reimburse the Estate for all costs or expenses of marketing, maintaining, insuring or preserving the Wagram Facility until the property is conveyed by the Estate. Upon payment of the Class 2 Secured Claim of Scotland County, Administrative Expense Claims, Priority Claims other than the VEBA Claim, and the Unsecured Claims Distribution as set forth above, the Net Sale Proceeds derived from the Wagram Facility shall be disbursed to Ronile in full satisfaction of the Ronile Secured-Wagram Claim.

**5.1.7.** Alternatively, upon the request of Ronile and in any event if the Wagram Facility has not been sold by the Trustee prior to filing the Final Report, the Wagram Facility shall be conveyed to Ronile subject to the Class 2 Secured Claim of Scotland County, in full satisfaction and as the indubitable equivalent of the Ronile Secured-Wagram Claim.

**5.1.8.** Class 1 is impaired.

**5.2.**     **Class 2: Scotland County Secured Claim.**

**5.2.1.** Scotland County shall retain its Lien on the Wagram Facility.

**5.2.2.** In the event of a sale of the Wagram Facility by the Trustee, the Class 2 Secured Claim shall be paid in full, with interest from the Petition Date at the applicable statutory rate, from the Net Sale Proceeds derived therefrom within thirty (30) days after the closing.

**5.2.3.**   In the event the Wagram Facility is conveyed to Ronile in satisfaction of the Ronile Secured-Wagram Claim, such conveyance shall be made subject to the Class 2 Secured Claim and Scotland County shall look solely to such property to satisfy its Secured Claim.

**5.2.4.**   Class 2 is not impaired and is conclusively deemed to have accepted the Plan.

**5.3.**        **Class 3:  VEBA Claim.**

**5.3.1.**   Payment of the VEBA Claim shall be subordinated until after (i) payment of Allowed Administrative Expense Claims, (ii) payment of Allowed Priority Claims other than the VEBA Claim, and (iii) payment of the Unsecured Claims Distribution as provided in section 5.5.1.

**5.3.2.**   Subject to the foregoing subordination provisions, the VEBA Claim shall be paid (without interest) from Available Cash within sixty (60) days after the Effective Date.

**5.3.3.**   Class 3 is impaired.

**5.4.**        **Class 4: Ronile Unsecured Claims.**

**5.4.1.**   Payment of the Ronile Unsecured Claims shall be subordinated until after (i) payment of Allowed Administrative Expense Claims, (ii) payment of Allowed Priority Claims other than the VEBA Claim, (iii) payment of the Unsecured Claims Distribution as provided in section 5.5.1, and (iv) payment of the VEBA Claim after payment of the Unsecured Claims Distribution pursuant to section 5.5.1.

**5.4.2.**   Subject to the foregoing subordination provisions, the Ronile Unsecured Claims shall be paid (i) an amount equal to 15% of the amount of the Ronile Unsecured Claims, (ii) an amount equal to 50% of the Avoidance Action Net Proceeds consistent with the provisions of section 5.5.1, and (iii) a pro rata share of the remaining Available Cash, pari passu with Class 5 Unsecured Claims, as and when determined by the Trustee in his reasonable discretion.

**5.4.3.**   Class 4 is impaired.

**5.5.**        **Class 5:  Unsecured Claims.**

**5.5.1.**   Holders of Allowed Unsecured Claims other than the Class 4 Ronile Unsecured Claims shall receive and be paid a distribution of 15% of their Allowed

Unsecured Claims (the "Unsecured Claims Distribution") within 14 days after the Effective Date, subject to reserves for claim objections or Bankruptcy Causes of Action pending against a creditor, or within 14 days of when an Unsecured Claim is subsequently Allowed by Court order or agreement of the Creditor and the party objecting to their Claim. The prosecution of any Bankruptcy Causes of Action shall not delay the payment of the Unsecured Claims Distribution except as provided above with respect to reserves.

In addition, in the event that the Unsecured Claims Distribution is paid in full and estate funds remain, the remaining funds shall be distributed first to satisfy the Ronile Secured Claims in full, then to the Ronile, Inc. Welfare Benefit Trust until the VEBA Claim is satisfied in full, then to Ronile to pay up to 15% of the Class 4 Ronile Unsecured Claims. If any estate funds remain following the initial distribution on account of the Class 4 Ronile Unsecured Claims up to 15%, then any such remaining funds shall be distributed *pro rata* to all of the holders of Allowed Unsecured Claims, including the Class 4 Ronile Unsecured Claims, until no estate funds remain.

The Trustee may prosecute the Bankruptcy Causes of Action permitted in section 10.2.2 below, and the Avoidance Action Net Proceeds shall be divided equally between (i) the holders of Class 5 Allowed Unsecured Claims, and (ii) Ronile. Also, in the event that the Debtor and/or the Trustee resolve any Bankruptcy Causes of Action without recovering a cash payment, but instead agree to accept the waiver, release or expungement of all or a portion of the unsecured claim of the defendant, then the economic value of such settlement to the Debtor's estate shall be divided equally between (i) the holders of Class 5 Allowed Unsecured Claims, and (ii) Ronile. By way of example, if a creditor holding a valid $100,000 Unsecured Claim agrees to waive its claim in exchange for the dismissal of an avoidance action against it, then before taking into consideration the transaction costs of such settlement, the value to the estate of such settlement is $15,000 on account of the 15% distribution that would have otherwise been made to such creditor had its claim been allowed in full. Such economic value will be divided equally between (i) the holders of Class 5 Allowed Unsecured Claims, and (ii) Ronile. The Trustee will pay the proceeds of such Bankruptcy Causes of Action in a second distribution to (i) holders of Class 5 Allowed Unsecured Claims, and (ii) Ronile

by no later than 30 days after the resolution of all Bankruptcy Causes of Action and objections to Unsecured Claims. Payments on account of the Avoidance Action Net Proceeds shall be paid to holders of Allowed Unsecured Claims regardless of how small the check might be.

    **5.5.2.** Class 5 is impaired.

    **5.6.**      **Class 6: Interests.**

    **5.6.1.** The existing Interests shall be extinguished and holders of Interests shall receive no distribution pursuant to the Plan.

    **5.6.2.** All shareholder rights shall vest in the Trustee, and the holders of Interests shall have no further voting or control rights.

    **5.6.3.** Class 6 is impaired and is conclusively deemed to have rejected the Plan.

    **6.** **MEANS FOR EXECUTION OF THE PLAN.** The Trustee shall execute and consummate the Plan as follows:

    **6.1.**      **Trustee**:

    **6.1.1.** On the Effective Date, Phillip C. Essig shall be deemed appointed as the Trustee under this Plan pursuant to § 1123 of the Bankruptcy Code. In the event the Trustee resigns, dies, becomes unable to serve in such capacity or is removed for cause after notice and hearing, the Bankruptcy Administrator shall appoint a successor trustee, subject to approval by the Court.

    **6.1.2.** The Trustee shall wind up the affairs of the Debtor, complete the final administration of the bankruptcy case, and execute and consummate the Plan as set forth herein. The Debtor shall remain in existence, but all control and management rights with respect to the Debtor shall vest in the Trustee, in lieu of managers, officers, directors, or members. The Trustee shall be responsible for any filings required under any Federal, state and/or local law to file tax returns or tax reporting for the Debtor whether arising prior to the Petition Date, post-petition or after the entry of the Confirmation Order.

    **6.1.3.** Upon entry of the Final Decree, the Trustee shall be discharged by the Court from further obligations and the Debtor's legal existence may be terminated under applicable state law.

6.2. **Property of the Estate**:  All of the Debtor's tangible and intangible assets (including but not limited to cash, funds on deposit, claims and Causes of Action) shall remain property of the Debtor's bankruptcy estate and shall not re-vest in the Debtor.

6.3. **Litigation**:  The Trustee shall evaluate and pursue to the extent deemed necessary, appropriate and warranted all claims or Causes of Action by or on behalf of the Debtor and the Estate. Pursuant to section 1123 of the Bankruptcy Code, the Trustee shall have the requisite standing to prosecute, pursue, administer, settle, litigate, enforce and liquidate all Causes of Action, including Bankruptcy Causes of Action subject to the limitations set forth in section 10.2.

6.4. **Distributions**:

6.4.1.  Within fourteen (14) days after the Effective Date, Ronile will be paid from the Debtor counsel's trust account the sum of $37,500 in consideration of the sale of the Superba Heatsetter, which Ronile claims was its property and not property of the Debtor's estate.  The remaining $37,500.00 will be transferred into the Debtor's unrestricted account for distribution in accordance with the Plan.

6.4.2.  The Ronile Secured Claims shall be paid in the manner and as provided in section 5.1.

6.4.3.  Available Cash will be distributed in payment of Allowed Administrative Expense Claims, Priority Tax Claims, the VEBA Claim, Class 4 Ronile Unsecured Claims and Class 5 Unsecured Claims in one or more distributions as provided in the Plan until paid in full.

6.4.4.  Distributions to holders of Allowed Claims shall be made at the address of each such holder as set forth on the Schedules filed with the Bankruptcy Court unless superseded by the address as set forth on the proof of claim filed by such holders or other subsequent writing notifying the Debtor and/or Trustee of a change of address.

6.4.5.  If any holder's distribution is returned as undeliverable, no further distributions to such holder shall be made unless and until the Trustee has been notified of such holder's then current address, at which time all missed distributions shall be made to such holder.  All unclaimed distributions which exist as of the date of the final distribution to holders of Allowed Claims shall be paid over to the U.S. Treasury as

provided in Section 347 and Bankruptcy Rule 3011 for unclaimed distributions as in a Chapter 7 proceeding.

**6.4.6.** Checks issued by the Trustee shall be null and void if not negotiated within sixty (60) days after the date of issuance thereof. Requests for re-issuance of any check shall be made to the Trustee by the holder of the Allowed Claim with respect to which such check originally was issued.

**6.4.7.** The Trustee may, but is not required to, in accordance with § 553 of the Bankruptcy Code and applicable non-bankruptcy law, set off or recoup against any Allowed Claim the distributions to be made pursuant to this Plan on account of such Claim (before any distribution is made on account of such Claim), the claims, rights and Causes of Action of any nature that the Trustee on behalf of the Estate, may possess against the holder of such Allowed Claim; provided, however, that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by the Trustee or the Estate of any such claims, rights and Causes of Action that they may possess against such holder; and provided further, that any claims by or on behalf of the Debtor arising before the Petition Date shall first be set off or recouped against Claims against the Debtor or the Estate arising before the Petition Date.

**6.5.** **Post-Confirmation**: The Trustee shall be authorized to perform all duties necessary to wind up the affairs of the Debtor, including without limitation, recovering or liquidating assets of the Estate, continuing or instituting litigation by or on behalf of the Debtor, reconciling claims filed against the Estate, and making distributions to the holders of Allowed Claims. The Court shall retain jurisdiction over all matters, and any party in interest may seek an Order in aid of consummation of the Plan in the event of any default or failure by any party to comply with the terms thereof. All Causes of Action brought by or on behalf of the Debtor shall be brought by the Trustee in the Court and are to be governed by Bankruptcy Rule 7001, et seq. Any compromise or other settlement of a controversy by or on behalf of the Debtor shall be approved in accordance with Bankruptcy Rule 9019.

**6.6.** **Executory Contracts and Leases**:

6.6.1.   All executory contracts or leases which have not been rejected or assumed prior to the Confirmation Date (excluding those which are then subject to a pending motion to assume) are and shall be deemed rejected as of the Effective Date.

6.6.2.   A Claim for damages arising from the rejection of an executory contract or lease shall be forever barred and shall not be enforceable against the Estate and no holder of any such Claim shall participate in any distribution under the Plan with respect to that Claim unless a Proof of Claim is served on the Trustee and filed with the Court within thirty (30) days after the Effective Date, or such other deadline as may be set by the Court generally or with respect to any lease or contract rejected, and said Proof of Claim is determined to be an Allowed Claim, either because no timely objection is filed or because the Court allows the Claim after a timely filed objection.

6.7.      **Business Records Retention:**  On and after the Effective Date, the Trustee shall maintain all of the Debtor's existing business records relevant and/or related to (i) unpaid accounts receivable, (ii) the business relationship and transactions between the Debtor and the entities identified in sections 10.2.2.1 through 10.2.2.14 below, (iii) objections to claims that were filed by the Debtor, but still pending as of the Effective Date, (iv) any Causes of Action and Bankruptcy Causes of Action that may be brought by the Trustee pursuant to this Plan, (v) the Debtor's insolvency during the ninety day period pre-petition, and (vi) necessary for filing any Federal, state and/or local tax returns or tax reporting for the Debtor whether arising prior to the Petition Date, post-petition or after the entry of the Confirmation Order.  Additionally, the Trustee shall maintain all electronic records as can reasonably be maintained within the storage capacity of the Debtor's electronic server.  With the exception of the foregoing, as of the Effective Date, the Trustee shall be authorized to destroy or dispose of the Debtor's business records in his reasonable discretion.

6.8.      **Setoff Rights:**  On or after the Effective Date, no right of setoff or recoupment may be asserted against the Debtor or its estate, unless such right has been properly preserved in a filed proof of claim.

7.  **FINANCIAL INFORMATION.**      The following information is or shall be made available to creditors and parties in interest:

7.1.    **Monthly and Quarterly Reports**:  A monthly report for each month the Debtor has been under the supervision of the Court has been and shall continue to be filed with the Court through and including the Effective Date. Thereafter a post-confirmation report shall be filed by the Trustee on a quarterly basis until the filing of the Final Report. Such quarterly reports shall reflect any progress made in consummating the Plan during the period covered by the report, shall be filed in the format prescribed by the Bankruptcy Administrator, and shall set forth and disclose the aggregate receipts and disbursements, the funds on deposit and the location of such accounts, any unpaid but accrued payables or obligations, the status of pending litigation, amounts available for distribution pursuant to the Plan, and such other information which is reasonably necessary to accurately disclose the financial condition of the Estate.  The Trustee shall file such reports within thirty (30) days after the end of each such quarterly period, and at the same time shall serve a copy thereon upon the Bankruptcy Administrator and any other party in interest making a written request therefore.

7.2.    **Financial Information on Record**:  The Debtor initially filed Schedules of Assets and Liabilities and a Statement of Financial Affairs.  The monthly reports, the Schedules of Assets and Liabilities, and the Statement of Financial Affairs may be inspected by interested parties in order to obtain a broader financial picture of the Debtor and the Estate.  These documents may be examined in the office of the Clerk of the United States Bankruptcy Court.

7.3.    **Disclosure Statement**: The Debtor filed a Disclosure Statement to accompany the filing of the Plan, to which reference is made for additional financial information.

## 8.  **PROVISIONS FOR IMPAIRED CREDITORS NOT ACCEPTING PLAN.**

8.1.    With respect to any Class of Claims impaired by and not accepting this Plan by the requisite majority in number and two-thirds (2/3) in dollar amount of those casting ballots, the Order confirming the Plan will fairly and equitably provide the requisite protection required by applicable provisions of the Bankruptcy Code.

8.2.    With respect to the holders of Interests, the existing Interests shall be extinguished and the holders shall not receive any distribution pursuant to the Plan.

**8.3.**     To the extent Plan confirmation by "cramdown" is necessary, the Debtor requests confirmation thereof pursuant to § 1129(b) of the Bankruptcy Code without further motion or notice at the Confirmation Hearing.

**9.     DISCHARGE AND RELEASE.**  As the Plan provides for the liquidation of all assets of the Estate and the Debtor will not continue business operations, the Plan does not provide for the discharge of any claims or liabilities.  However, all proceedings and court actions seeking to establish or enforce pre-petition liabilities and claims of any nature against property of the Estate or priorities received or retained by any creditor with respect to debts and obligations of the Debtor shall be stayed and treated as specifically provided for in the Plan.

**10. PROVISIONS FOR RETENTION OF JURISDICTION AND PROSECUTION AND DEFENSE OF CLAIMS AND CAUSES OF ACTION.**  The Court shall retain and may exercise its jurisdiction for determination in this proceeding of any objections to claims not disposed of prior to the entry of the Confirmation Order, the final determination of any Causes of Action (including Bankruptcy Causes of Action) belonging to the Debtor or the Estate, and any other matters which might affect the Debtor, the Estate, or the consummation of the Plan, including but not limited to the following:

**10.1.**     **General Jurisdiction**: Until the case is closed, the Court shall retain jurisdiction pursuant to § 1142 of the Bankruptcy Code and Bankruptcy Rules 3020(d) and 3021 to the extent necessary to implement the Plan; to hear and determine all claims against the Debtor; to hear, determine, and enforce all Causes of Action (including Bankruptcy Causes of Action) arising in, arising under, or related to this case and which may exist on behalf of the Debtor; and to confirm after Notice and Hearing (except as otherwise provided herein) any proposed compromise of any Cause of Action (including Bankruptcy Causes of Action).  Nothing contained herein shall prevent the Trustee from taking such action as may be necessary in the enforcement of any Cause of Action, and nothing contained herein shall prevent any creditor from enforcing any claim it may have against third parties who may be liable as a result of the Debtor's obligations to such creditor.

**10.2.**     **Causes of Action**:

**10.2.1.** Notwithstanding the confirmation and Substantial Consummation of the Plan, the Trustee shall retain the right and standing to assert and shall have the sole and exclusive right to commence, pursue, settle, compromise, abandon, waive, or release any

claim or Cause of Action which may exist by or on behalf of the Debtor (including Bankruptcy Causes of Action) which accrued and were asserted or capable of assertion by the Debtor as a debtor-in-possession as of or after the Petition Date.

**10.2.2.** With the exception of the creditors listed in this section, the Debtor and the Trustee shall <u>not</u> pursue any Bankruptcy Causes of Action against any creditor or party and upon the Effective Date the right of any party (including the Trustee) to pursue any such Bankruptcy Causes of Action are and shall be deemed waived. The Trustee may pursue Bankruptcy Causes of Action only against the following creditors:

      **10.2.2.1.** C&S Carpet Distribution

      **10.2.2.2.** Carolina Power and Light Company

      **10.2.2.3.** CCA Global Partners

      **10.2.2.4.** Dream Weaver Industries, Inc.

      **10.2.2.5.** ETEX America, Inc.

      **10.2.2.6.** Federal Express Corporation

      **10.2.2.7.** Hess Corporation

      **10.2.2.8.** Home Depot

      **10.2.2.9.** International Polymerics, Inc.

      **10.2.2.10.** Mattex USA, LLC

      **10.2.2.11.** Mega Force Staffing Group, Inc.

      **10.2.2.12.** National Floorcovering Alliance

      **10.2.2.13.** Textile Rubber & Chemical Company

      **10.2.2.14.** U.S. Security Associates, Inc.

**10.3.** <u>**Specific Retention of Powers**</u>: In addition to the general provisions set forth above, the Court shall retain sole jurisdiction of this case pursuant to the provisions of Chapter 11 of the Bankruptcy Code for the following purposes, *inter alia*:

**10.3.1.** To classify, allow or disallow Claims and Interests, to direct distributions of funds under the Plan, and to hear and determine any controversies pertaining thereto.

**10.3.2.** To hear and determine any and all applications, adversary proceedings or other matters arising out of or related to the Plan.

**10.3.3.** To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked or vacated.

**10.3.4.** To liquidate or estimate the amount of any claim, or to determine the manner and time for such liquidation or estimation in connection with any contingent or unliquidated claim.

**10.3.5.** To adjudicate all disputes with respect to claims or any Lien on any property of the Estate.

**10.3.6.** To adjudicate all claims or controversies arising during the pendency of this case.

**10.3.7.** To recover all assets and properties of the Estate, wherever located, including recoveries on all claims and Causes of Action brought by the Debtor prior to the Effective Date or capable of being brought by the Debtor, or the Trustee on behalf of the Debtor, prior or subsequent to the Effective Date which are not released, settled or otherwise compromised by the terms of this Plan.

**10.3.8.** To hear and determine matters covering federal, state, and local taxes pursuant to Sections 346, 1146, 505 and 525 of the Bankruptcy Code.

**10.3.9.** To allow fees and reimbursement of the expenses of the Trustee and of professional persons employed by the Debtor, the Committee or the Trustee during this case or any other person or entity applying for compensation.

**10.3.10.** To construe or enforce the Plan so as to effectuate payments thereunder or to compel performance by any person reasonably necessary to achieve Final Consummation in accordance with the provisions hereof.

**10.3.11.** To make and enforce such orders as are necessary or appropriate to carry out the provisions of the Plan.

**10.3.12.** To enter such orders as may be necessary and proper for the orderly administration of the Debtor's bankruptcy proceeding.

**10.3.13.** To decide such other matters and for such other purposes as may be provided for in the Confirmation Order.

**11. <u>PROVISIONS FOR AMENDMENT OF THE PLAN.</u>** The Plan may be amended as follows:

**11.1.** <u>Non-material Amendment</u>: The Plan may be altered or modified by the Debtor after its submission for acceptance and before or after its confirmation but prior to the Effective Date, without Notice and Hearing, if the alteration or modification does not

adversely change the treatment of the claim of any creditor as provided in Section 1127 of the Bankruptcy Code and in Bankruptcy Rule 3019, with the written consent of the Committee and Ronile.

**11.2.** **Material Amendment**: The Plan may be altered or modified by the Debtor after submission for acceptance and before or after confirmation but prior to the Effective Date in a manner which adversely affects the interests of creditors, only (i) after Notice and Hearing before the Court for the confirmation of such alteration or modification, as provided in Section 1127 of the Bankruptcy Code, (ii) with the written consent of the specific creditors who are adversely affected, or (iii) with the written consent of the Committee and Ronile.

**11.3.** **Amendment After The Effective Date.** The Plan may be altered or modified by the Trustee after the Effective Date but prior to Substantial Consummation only (i) after Notice and Hearing before the Court for the confirmation of such alteration or modification, as provided in Section 1127 of the Bankruptcy Code, (ii) with the written consent of the specific creditors who are adversely affected, or (iii) with the written consent of the Committee and Ronile.

**12. OBJECTIONS TO CLAIMS, RESERVES AND DISTRIBUTIONS.**

**12.1.** **Claims**:

**12.1.1.** The Debtor shall file all objections to Claims by no later than September 23, 2013, and any other party in interest (but expressly excluding Ronile and the VEBA) shall file other objections to Claims prior to the Confirmation Date. Objections not filed within such periods, respectively, shall be deemed waived. Ronile, the VEBA and the Trustee shall have no standing, authority or right to file or assert objections to Claims. Notwithstanding the foregoing, the Trustee shall have standing, authority and the right to object to (i) Claim No. 129 filed by WestPoint Home, LLC in the event the WestPoint Claim Settlement is not approved by the Court, and (ii) any Claim or amendment to a Claim that is filed on or after September 23, 2013.

**12.1.2.** The absence of a filed objection, whether as to a scheduled or filed Claim, prior to the deadline for voting to accept or reject the Plan shall not be deemed an acceptance of any Claim nor a waiver of the right to object to any Claim, and the holder

of any such Claim shall not be entitled to assert reliance upon any implied acceptance of such Claim when voting to accept or reject the Plan.

**12.1.3.** If an objection to a Claim is not timely filed as required above, said Claim shall be allowed in the amount it was scheduled or filed, whichever is greater, except to the extent otherwise provided in this Plan with respect to the allowance of the Ronile Secured Claims, the VEBA Claim and the Ronile Unsecured Claims.

**12.1.4.** Confirmation of this Plan shall constitute allowance of the Ronile Secured Claims, the VEBA Claim and the Ronile Unsecured Claims as provided in sections 5.1, 5.3 and 5.4, respectively, and any pending objections to such claims shall be deemed overruled. Any other claims asserted or filed by Ronile or the VEBA that are not expressly Allowed in this Plan shall be deemed disallowed and expunged and shall not be entitled to any distribution.

**12.2.**   **Reserves**: Any claim, or portion thereof, which is to be paid in cash under the Plan and which is challenged, shall be protected by requiring the Trustee to segregate and set aside in an escrow account a reserve sufficient to treat said claim in the same fashion as though the objection were denied.  The reserve so segregated shall be distributed in accordance with the Plan in the event the objection is overruled or a dispute is resolved in favor of the party asserting the claim.  In the event the Disputed Claim is disallowed, the retained cash so segregated shall be retained available for distribution as Available Cash in accordance with the provisions of this Plan, with the disallowed claimant being excluded from the appropriate Class.

**13. GENERAL PROVISIONS.**

**13.1.**   **Exculpation.**  Neither the Debtor, the Committee, the Trustee or any of their respective employees, advisors, attorneys, accountants, consultants or agents shall have or incur any liability for or to any holder of a Claim or Interest for any act or omission in connection with, or arising out of, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

**13.2.** **Ronile Release.** Ronile and its employees, owners, directors, attorneys, accountants, and affiliates, and their respective successors and assigns (excluding any party who purchased or purchases any assets of the Debtor, Ronile and/or the bankruptcy estate), shall be released from any and all claims which could be asserted by or on behalf of the Debtor or its estate, whether directly, indirectly or on a derivative basis, including but not limited to claims arising pre-petition, all Bankruptcy Causes of Action, including without limitation claims for voidable preferences, fraudulent conveyances, and any and all theories of equitable subordination or recharacterization of any and all of its claims, and any other claims arising post-bankruptcy except as may be required to enforce compliance with the Plan.

**13.3.** **Binding Effect.** The Plan shall be binding upon and inure to the benefit of the Debtor, the Committee, the Trustee, holders of Claims and holders of Interests, and their respective successors and assigns.

**13.4.** **Injunctions or Stays**. Unless otherwise provided in the Plan, the Confirmation Order or other Orders of this Court, all injunctions or stays generally provided for Chapter 11 cases under Section 105 or 362 of the Bankruptcy Code or otherwise in existence on the Effective Date shall remain in full force and effect until the entry of a Final Decree dismissing the case.

**13.5.** **Notices.** Any notice required to be provided to parties in interest under the Bankruptcy Code or Rules or under the Plan shall be in writing and served by (a) regular mail, postage prepaid, (b) hand delivery, or (c) overnight delivery service, addressed to the appropriate parties and with copies of any such notice to be sent to the Bankruptcy Administrator and to the Trustee.

**13.6.** **Governing Law**. Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or, as to corporate matters, the laws of the jurisdiction in which the Debtor is incorporated, the laws of the State of North Carolina, shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan.

**13.7.** **Plan Controls**. Subject to the provisions of the Confirmation Order, to the extent any provision of the Disclosure Statement or any instrument, document, exhibit or agreement executed in connection with the Plan (or any exhibits, schedules, supplements or

amendments to the foregoing) conflicts with or is in any way inconsistent with the terms of the Plan, the terms and provisions of the Plan shall govern and control.

13.8.    **Payment of Statutory Fees**.  All fees payable pursuant to 28 U.S.C. § 1930 shall be paid on or before the Effective Date by the Debtor.  After the Effective Date, the Trustee shall be responsible to pay all fees payable pursuant to 28 U.S.C. §1930 that accrue before or after the Effective Date.

13.9.    **Administrative Bar Date**.  The bar date or last date for filing any proof of claim for an Administrative Claim, exclusive of Administrative Claims of professionals retained by the Debtor and the Committee and the reimbursement of Committee member expenses, for Administrative Claims that have accrued between the Petition Date and the Effective Date shall be thirty (30) days after the Effective Date.  Such Administrative Claims shall be filed with the Clerk of the Bankruptcy Court, 101 S. Edgeworth St., Greensboro, North Carolina, 27401, with a copy sent to Debtor's counsel.  The failure to timely file such an Administrative Claim as required by this provision shall bar such Administrative Claim from being allowed or paid.

RESPECTFULLY submitted, this the 8th day of October, 2013.

/s/ Phillip Essig, on behalf of Hampton Capital Partners, LLC
/s/John A. Northen, counsel for Hampton Capital Partners, LLC

**Counsel for the Debtor:**
John A. Northen, NCSB #6789
jan@nbfirm.com
Vicki L. Parrott, NCSB #25449
vlp@nbfirm.com
John Paul H. Cournoyer, NCSB #42224
jpc@nbfirm.com
Northen Blue, LLP
Post Office Box 2208
Chapel Hill, NC 27515-2208
Telephone:  919-968-4441

| Class | Type | Creditor | Scheduled Amount | Claim No. | Filed Amount | Est. Allowed Amount | Comments |
|---|---|---|---|---|---|---|---|
| 1 | Secured | Ronile, Inc. | $18,200,000 | 133 | $13,190,950 | $2,009,957 | Wagram value est at $500,000 |
| 2 | Secured | Scotland County Tax Collector | $36,435 | | | $36,435 | |
| 3 | Priority Benefit | Ronile Welfare Benefit Trust | $760,696 | 124 | $886,711 | $886,711 | |
| 4,5 | Unsecured | 1SYNC INC. | $3,400 | | | $3,400 | |
| | | 3M PROTECTIVE | $13,846 | 3 | | $13,846 | |
| | | A T & T CORP | $4,143 | 113 | $9,817 | $9,817 | |
| | | A.B. CARTER INC. dba Carter Traveler Co. | $1,373 | | | $1,373 | |
| | | ABBEY CARPET COMPANY INC. | $34,419 | | | $34,419 | |
| | | Abbey Group | $48,984 | | | $48,984 | |
| | | Aberdeen Carolina & Western Railway | $3,160 | 45 | $4,160 | $4,160 | |
| | | ABERDEEN EXTERMINATING CO INC. | $175 | | | $175 | |
| | | ABLE MACHINE HYDRAULICS & PLATING INC. | $623 | | | $623 | |
| | | AC Controls Company, Inc. | $438 | 87 | $438 | $438 | |
| | | Acme Southern, Inc. | $471 | 42 | $1,055 | $1,055 | |
| | | ACUITY SPECIALTY PRODUCTS GRP. | $116 | | | $116 | |
| | | ADVANCED FLOORING INSPECTIONS | $1,600 | | | $1,600 | |
| | | AFP Industries, Inc. | $204 | 69 | $204 | $204 | |
| | | ALBEE, JOHN | | | | $335 | |
| | | Alliance Distribution Inc. | $975,745 | 122 | $943,522 | $943,522 | claim objection pending |
| | | ALLIED ELECTRONICS CORP. | $327 | | | $327 | |
| | | ALO, LINDY | $116 | | | $116 | |
| | | Amcor, Inc. | $2,174 | 49 | $2,174 | $2,174 | |
| | | American Home Surfaces | $110 | | | $110 | |
| | | AMERICAN SCALE CO. INC. | $3,020 | | | $3,020 | |
| | | AMERICAN STAINLESS & SUPPLYLLC | $235 | | | $235 | |
| | | AMERICAN SUPERBA INC. | $17,044 | | | $17,044 | |
| | | AMS Services | $0 | 30 | $954 | $954 | |
| | | APPLIED INDUSTRIAL TECHNOLOGIE | $9,134 | | | $9,134 | |
| | | AQUA-CHEM SOLUTIONS LLC | $167 | | | $167 | |
| | | ARROWSTAR LLC dba Arrow Engineering | $15,392 | | | $15,392 | |
| | | Ascend Performance Materials | $594,717 | 117 | $594,717 | $594,717 | |
| | | Associated Bag Company | $734 | 24 | $734 | $734 | |
| | | ASSOCIATED BATTERY CO. | $2,920 | | | $2,920 | |
| | | AUTOMATED DATA PROCESSING INC. | $3,414 | | | $3,414 | |
| | | AVERITTS ELECTRIC MOTOR REPAIR INC. | $2,059 | | | $2,059 | |
| | | B & T INC. dba The Floor Club | $1,025 | | | $1,025 | |
| | | BAILEY, GAYLON dba Floorsolutions | $178 | | | $178 | |
| | | Baker Brothers | $790 | | | $790 | |
| | | BAMCO BELTING PRODUCT INC. | $846 | | | $846 | |
| | | BEAN, RICHARD | $591 | | | $591 | |
| | | BEAULIEU GROUP LLC | $10,036 | | | $10,036 | |
| | | BEFORE YOU HIRE INC. | $54 | | | $54 | |
| | | Belair Carpet | $4,212 | | | $4,212 | |
| | | BELMONT TEXTILE MACHINERY CO | $808 | | | $808 | |
| | | Best Cartage, Inc. | $4,154 | 12 | $4,154 | $4,154 | |
| | | Best Dedicated, LLC | $225,675 | 13 | $233,740 | $233,740 | |
| | | BETTER BUSINESS FORMS dba Clondalkin Gro | $3,267 | 14 | $3,267 | $3,267 | |
| | | BFI-WASTE SERVICES LLC dba Allied Waste | $3,426 | | | $3,426 | |
| | | BFPE INTERNATIONAL | $611 | | | $611 | |
| | | BOILER MASTERS INC. | $76 | | | $76 | |
| | | Boise Floor Covering & Design, Inc. | $0 | 57 | $2,161 | $2,161 | |
| | | Brame Specialty Company | $2,966 | 9 | $2,966 | $2,966 | |
| | | Braun's Express, Inc. | $17,402 | 26 | $24,793 | $24,793 | |
| | | BRIGGS EQUIPMENT INC. | $9,404 | | | $9,404 | |
| | | BROWN INDUSTRIES INC. | $14,978 | 10 | $15,675 | $15,675 | |

| Class | Type | Creditor | Scheduled Amount | Claim No. | Filed Amount | Est. Allowed Amount | Comments |
|---|---|---|---|---|---|---|---|
| | | BUCHANAN, PAUL | $133 | | | $133 | |
| | | Bud Polley's Floor Center Inc. | $1,441 | | | $1,441 | |
| | | BULLDOG BATTERY CORPORATION dba Powerflo | $3,780 | | | $3,780 | |
| | | Burney Hardware Co. | $0 | 7 | $2,274 | $2,274 | |
| | | Butler Carpet | $9,749 | | | $9,749 | |
| | | Butler Floor & Carpet Co., Inc. | $0 | 96 | $122 | $122 | |
| | | BYLSMA, PATRICIA | $588 | | | $588 | |
| | | C & C PUMP & COMPRESSOR CO. | $2,882 | | | $2,882 | |
| | | C & S CARPET DISTRIBUTION | $5,599 | | | $5,599 | |
| | | C. C. Dickson Co. | $2,940 | 47 | $3,060 | $3,060 | |
| | | CANADY'S INC. | $100 | | | $100 | |
| | | Canon Financial Services, Inc. | $758 | 50 | $25,568 | $758 | claim objection pending |
| | | CARD-MONROE CORP | $4,104 | | | $4,104 | |
| | | CARLTON-BATES CO. | $148 | | | $148 | |
| | | Carmeuse Lime & Stone | $0 | 118 | $69,103 | $69,103 | |
| | | CAROLINA BRUSH MANUFACTURING | $383 | | | $383 | |
| | | Carolina Container Company | $4,767 | 5 | $4,767 | $4,767 | |
| | | Carolina Power & Light Company | $100,878 | | | $100,878 | |
| | | CAROLINA ROLLER AND SUPPLY CO | $121 | | | $121 | |
| | | Carpet Giant | $392 | | | $392 | |
| | | Carpet One/Commercial Flooring | $0 | 127 | $543 | $543 | |
| | | Carpet Industry Clearinghouse | $5,934 | 39 | $10,374 | $10,374 | |
| | | Carpet Outlet of Texas | $101 | | | $101 | |
| | | CARPET RESCUE dba Northeast Inspection S | $230 | | | $230 | |
| | | CARPET SERVICES PLUS | $195 | | | $195 | |
| | | Carpet Shoppe Inc. | $735 | | | $735 | |
| | | Carpets by Dennis | $185 | | | $185 | |
| | | Carpets by French | $2,304 | | | $2,304 | |
| | | Carpets Plus | $10,859 | | | $10,859 | |
| | | CARP-I-GRAPHICS INC. | $162 | | | $162 | |
| | | CARRIER ENTERPRISES LLC DBA Carrier Sout | $332 | | | $332 | |
| | | CCA Global | $209,194 | 108 | $209,922 | $209,922 | |
| | | CDW LLC | $746 | | | $746 | |
| | | Central Security Systems, Inc. | $10,000 | 53, 123 | $17,034 | $17,034 | claim objection pending |
| | | CENTURY TELEPHONE COMPANY (NC) | $1,130 | | | $1,130 | |
| | | CERTIFIED FLOORING INSPECTIONS | $300 | | | $300 | |
| | | CERTIFIED SURFACE INSPECTIONS | $150 | | | $150 | |
| | | CHADWICK & ASSOCIATES MANAGEMENT SYSTEMS | $468 | | | $468 | |
| | | CHEM-TEX LABORATORIES INC. | $31,030 | | | $31,030 | |
| | | CHEMTREAT INC. | $2,084 | | | $2,084 | |
| | | CITIBANK (SOUTH DAKOTA) N.A. | $107 | | | $107 | |
| | | CLASSIC GRAPHICS | $1,520 | | | $1,520 | |
| | | COFFEY, BOB | $788 | | | $788 | |
| | | COLE-PARMER INSTRUMENT CO | $381 | | | $381 | |
| | | COMPRESSED AIR SYSTEMS INC. | $5,277 | | | $5,277 | |
| | | Consolidated Electrical Distributors | $730 | 8 | $738 | $738 | |
| | | COOPER, MICHELLE | $255 | | | $255 | |
| | | COPIA LABS INC | $918 | | | $918 | |
| | | COX, CARLA | $44 | | | $44 | |
| | | CREAGHAN, LAUREN | $1,021 | | | $1,021 | |
| | | CROSS SALES & ENGINEERING CO. | $653 | | | $653 | |
| | | Crossville Wholesale Cpt. | $44 | | | $44 | |
| | | D & M ENTERPRISE OF GA. LLC | $182 | | | $182 | |
| | | DATA IMAGING SUPPLIES | $4,928 | | | $4,928 | |
| | | DATAMARK GRAPHICS INC. | $4,400 | | | $4,400 | |
| | | Deco Surfaces; Attn: Managing Agent | $4,210 | | | $4,210 | |
| | | Decorating Den | $1,351 | | | $1,351 | |
| | | DELTONDO-CONNELLY, ALLISON dba Flooring | $300 | | | $300 | |
| | | Dewey Furniture & Carpet, Inc. | - | 75 | $3,509 | $3,509 | claim objection pending |
| | | Dillon Supply Co. | $3,253 | 21 | $3,253 | $3,253 | |

| Class | Type | Creditor | Scheduled Amount | Claim No. | Filed Amount | Est. Allowed Amount | Comments |
|---|---|---|---|---|---|---|---|
| | | Direct Buy Convention | $3,206 | | | $3,206 | |
| | | Dixie Group, Inc., dba Candlewick Yarns | $189,330 | 91 | $189,330 | $237,127 | filed claim plus allowed claim per consent order |
| | | DNA FLOOR SURGEONS INC. | $325 | | | $325 | |
| | | Dream Weaver Industries, Inc. | $91,066 | 6 | $90,841 | $91,066 | |
| | | DURAND, CURTIS R. dba Eye Spy Floor Serv | $250 | | | $250 | |
| | | Dynamic Flooring, LLC | | 148 | $1,087 | $0 | claim objection pending |
| | | EAGLE F/C INSPECTION LLC | $175 | | | $175 | |
| | | EAGLE PARTS & MACHINERY INC | $680 | | | $680 | |
| | | ECO INTERIOR MAINTENANCE INC. | $500 | | | $500 | |
| | | Electrical Equipment Company | $6,255 | 46 | $6,307 | $6,307 | |
| | | Elite Consultants, Inc. | $300 | 27, 31 | $300 | $300 | |
| | | EMORY WILSON PROCESS LLC | $594 | | | $594 | |
| | | EPIC ENTERPRISES INC. | $50,812 | | | $50,812 | |
| | | ESSEX INC. | $90 | | | $90 | |
| | | ESSILOR LABORATORIES OF AMER. Dba Southe | $138 | | | $138 | |
| | | Estes Express Lines | $0 | 93 | $1,125 | $1,125 | |
| | | ETEX AMERICA INC. | $73,315 | | | $73,315 | |
| | | EXPRESS CONTAINER SERIVICES OF ATLANTA L | $370 | | | $370 | |
| | | Family Carpet Outlet | $1,052 | | | $1,052 | |
| | | Fastenal Company | $1,841 | 115 | $1,918 | $1,918 | |
| | | FAULKNER, MICHAEL | $2,071 | | | $2,071 | |
| | | Fedex Tech Connect | $23,292 | 114 | $25,861 | $25,861 | |
| | | FERBER CARPET SERVICE INC. | $948 | | | $948 | |
| | | FISKARS BRANDS INC. | $442 | | | $442 | |
| | | Fitz Flooring Ltd | $81 | | | $81 | |
| | | FLETCHER INDUSTRIES INC. | $890 | | | $890 | |
| | | Floor Covering Associates | $6,001 | | | $6,001 | |
| | | Floor To Ceiling | $11,972 | | | $11,972 | |
| | | Flooring Technology, Inc. | $140 | 62 | $414 | $414 | |
| | | Floors With Flair | | 61 | $2,175 | $2,175 | |
| | | FORMS & SUPPLY INC | $563 | | | $563 | |
| | | FOSS, HARRY | $221 | | | $221 | |
| | | FOSTECH SERVICES INC. | $217 | | | $217 | |
| | | Foulk Decorating Co., Inc. dba Foulk's Flooring America | $0 | 92 | $1,633 | $1,633 | |
| | | GENERAL ELECTRIC CAPITAL CORP. dba GE Ca | $115 | 97 | $3,402 | $3,402 | |
| | | GENERAL ELECTRIC CAPITAL CORP. dba GE Ca | | 98 | $5,376 | $5,376 | |
| | | GENERAL ELECTRIC CAPITAL CORP. dba GE Ca | | 99 | $2,631 | $2,631 | |
| | | GILBERT, JEFFREY C. | $328 | | | $328 | |
| | | GILBOS OF AMERICA | $890 | | | $890 | |
| | | GK Flooring, Inc. dba Carpet Crown | $3,294 | 143 | $6,358 | $3,294 | claim objection pending |
| | | GLORIOSO, NICHOLAS A. | $81 | | | $81 | |
| | | Golden Rule Plastics, Inc. | $417 | 103 | $417 | $417 | |
| | | GROVES, PHILLIP L. | $102 | | | $102 | |
| | | GXS INC. | $1,970 | | | $1,970 | |
| | | HABER, SCOTT | $1,225 | | | $1,225 | |
| | | HAMMOND, TOM | $200 | | | $200 | |
| | | HARRELL MACHINERY SALES | $7,000 | | | $7,000 | |
| | | HEARTLAND CARPET & FLOOR SERVS | $165 | | | $165 | |
| | | HENDON, HARPER M. | $486 | | | $486 | |
| | | HENRY WINKLER CO., INC. dba Floor Coveri | $125 | | | $125 | |
| | | HESS CORPORATION | $50,000 | | | $50,000 | |
| | | HOHENSTEIN, THOMAS E. | $326 | | | $326 | |
| | | Home Depot | $0 | | | $0 | |
| | | Huntsman International Inc. | $10,622 | 116 | $10,622 | $10,622 | |
| | | IBM Credit, LLC | $4,696 | | | $4,696 | |
| | | INDEPENDENT TEXTILE TESTING SERVICE INC. | $1,137 | | | $1,137 | |
| | | INDUSTRIAL PACKAGING SUPPLIES | $1,031 | | | $1,031 | |
| | | Inside Effects | $145 | | | $145 | |
| | | INTERNATIONAL PAPER dba XPEDX | $1,590 | | | $1,590 | |
| | | International Polymerics, Inc. | $17,100 | 16 | $17,100 | $17,100 | |

| Class | Type | Creditor | Scheduled Amount | Claim No. | Filed Amount | Est. Allowed Amount | Comments |
|---|---|---|---|---|---|---|---|
| | | Isensee Floorcovering, Inc. | | 147 | $13,909 | $0 | claim objection pending |
| | | JANTECH SERVICES INC. | $3,400 | | | $3,400 | |
| | | Jasper Carpets | $553 | | | $553 | |
| | | JOE MOORE AND COMPANY INC | $5,355 | | | $5,355 | |
| | | JOHNSON MORGAN & WHITE | $402 | | | $402 | |
| | | Kastran Karpets | $789 | | | $789 | |
| | | KEYSTONE (US) MANAGEMENT INC. dba Tyco I | $6,065 | | | $6,065 | |
| | | Kisers Floor Fashions | $335 | | | $335 | |
| | | KOCH FIBERS C.V. dba Invista S.A.R.L. | $9,115,734 | | | $2,750,000 | allowed claim pursuant to settlement order |
| | | KUSTERS-ZIMA CORPORATION | $330 | | | $330 | |
| | | Labtest International, Inc. DBA Intertek | $3,208 | 38 | $4,256 | $4,256 | |
| | | LEVEY, RICHARD S. dba M.C.C.I. | $195 | | | $195 | |
| | | LEWIS BACKHOE SERVICE LLC | $12,067 | | | $12,067 | |
| | | LIAISON TECHNOLOGIES INC. | $7,088 | | | $7,088 | |
| | | LIVINGSTON INTERNATIONAL INC. | $7,031 | | | $7,031 | |
| | | LMT TUFTING | $12,118 | | | $12,118 | |
| | | Lonesome Oak Trading Co., Inc. | $25,911 | 77 | $26,154 | $26,154 | |
| | | Lowes Canada | $8,978 | | | $8,978 | |
| | | M. DOHMEN USA INC. | $1,562 | 112 | $1,562 | $1,562 | |
| | | MADISON, ERIK | $83 | | | $83 | |
| | | Main Street Flooring & Interiors, LLC | $916 | 35 | $916 | $916 | |
| | | MALLARD CREEK POLYMERS INC. | $267,949 | | | $267,949 | |
| | | MALONE, PATRICK | $547 | | | $547 | |
| | | Manufacturers Chemicals | $1,995 | 72 | $1,995 | $1,995 | |
| | | Marketing Alliance Group, Inc. | $10,496 | 121 | $9,406 | $10,496 | |
| | | MARLBORO MECHANICAL INC. | $1,260 | | | $1,260 | |
| | | Marty's Contract Carpet, Inc. | $0 | | | $0 | |
| | | MASTER'S TOUCH CARPET CARE INC | $200 | | | $200 | |
| | | Matt Marshall & Company, Inc. | $1,246 | 11 | $1,246 | $1,246 | |
| | | Mattex USA, LLC | $43,164 | 56 | $43,139 | $43,164 | |
| | | MCCONNELL, TODD | $1,767 | | | $1,767 | |
| | | McCoy, Roger Kent dba AMS Services | $954 | | | $954 | |
| | | MCFARLAND, KEATON P. | $321 | | | $321 | |
| | | MCLEOD LEATHER &BELTING CO INC | $2,091 | | | $2,091 | |
| | | McMaster-Carr Supply Company | $6,614 | 29 | $7,186 | $7,186 | |
| | | Mega Force Staffing Group Inc. | $53,026 | 126 | $54,044 | $54,044 | |
| | | Mega Industries | $914 | 20 | $914 | $914 | |
| | | MESIGH, DAVID ALLEN | $2,644 | | | $2,644 | |
| | | Meuth Carpets | $3,786 | | | $3,786 | |
| | | MEUTH, FORREST | $167 | | | $167 | |
| | | MEUTH, MARY | $206 | | | $206 | |
| | | Meyer Laboratory, Inc. | $475 | 1 | $475 | $475 | claim objection pending |
| | | MICATJEN LLC dba Sandshills Office Suppl | $1,203 | | | $1,203 | |
| | | MICROBAC-FAYETTEVILLE DIVISION dba Micro | $1,297 | | | $1,297 | |
| | | MIDWEST INSPECTION SERVICES | $273 | | | $273 | |
| | | MITTIE, RICHARD L. dba Flooring Inspecti | $405 | | | $405 | |
| | | MONTELL III, THOMAS JAMES | $236 | | | $236 | |
| | | Morrisette Paper Company Inc. | $1,053 | 125 | $1,053 | $1,053 | |
| | | Motion Industries | $46 | 109 | $46 | $46 | |
| | | MR. ED'S INSPECTIONS | $241 | | | $241 | |
| | | Mt. Pleasant Floor Covering | $1,031 | 18 | $1,031 | $1,031 | |
| | | NATIONAL FLOORCOVERING ALLIANCE | $152,875 | | | $152,875 | |
| | | NATIONAL WELDERS SUPPLY CO INC DBA Airga | $614 | | | $614 | |
| | | NATURE'S OWN INC. DBA Mountain Clear Spr | $42 | | | $42 | |
| | | NEGAARD, STEVEN J. | $458 | | | $458 | |
| | | NMHG FINANCIAL SERVICES INC. | $1,378 | 99 | $14,683 | $14,683 | |
| | | NOLTE, KURT | $113 | | | $113 | |
| | | NORRIS, KATHI | $137 | | | $137 | |
| | | Norville Industries, Inc. | $219,063 | 36 | $219,063 | $219,063 | |
| | | Nu Floors | $434 | | | $434 | |

| Class | Type | Creditor | Scheduled Amount | Claim No. | Filed Amount | Est. Allowed Amount | Comments |
|---|---|---|---|---|---|---|---|
| | | OERLIKON TEXTILE INC. | $516 | | | $516 | |
| | | OLSEN FLOOR CONSULTING LLC dba Olsen Ins | $150 | | | $150 | |
| | | O-N (CHEMSTONE) COMPANY | $49,729 | | | $49,729 | |
| | | OTTO ZOLLINGER INC | $273 | | | $273 | |
| | | P&O Packaging, LLC | $20,678 | 37 | $20,678 | $20,678 | |
| | | Paramount Printing, LLC | $22,817 | 120 | $22,817 | $22,817 | |
| | | PERSICKETTI, MATT | $202 | | | $202 | |
| | | PETRASUNAS, STEVE | $218 | | | $218 | |
| | | PHARR YARNS LLC. | $37,912 | | | $37,912 | |
| | | Phoenix Chemical Company, Inc. | $8,869 | 94 | | $8,869 | |
| | | Piedmont Natural Gas | $42,971 | 80 | $43,360 | $43,360 | |
| | | Praxair Distribution, Inc. | $526 | 135 | $8,064 | $526 | claim objection pending |
| | | PRECISION LOOPERS INC. | $2,824 | | | $2,824 | |
| | | PREMIER WATER & ENERGY TECHNOL | $5,314 | | | $5,314 | |
| | | PRIORITY ONE INSPECTIONS | $485 | | | $485 | |
| | | PROCESS TECHNICAL SALES INC. | $233 | | | $233 | |
| | | ProData | $0 | | | $0 | |
| | | PROGENT CORPORATION | $326 | | | $326 | |
| | | PROPEX OPERATING COMPANY LLC | $248,714 | | | $248,714 | |
| | | Prosource of Denver | $513 | | | $513 | |
| | | PROVIDENT LIFE & ACCIDENT | $1,942 | | | $1,942 | |
| | | QUALITY OIL & GAS COMPANY | $3,505 | | | $3,505 | |
| | | RAINEY, TIMOTHY L. | $1,767 | | | $1,767 | |
| | | RANSDELL HARDWARE & SUPPLY CO. | $2,186 | | | $2,186 | |
| | | RASKIS, PETER J. | $48 | | | $48 | |
| | | Rayo Wholesale Inc. | $580 | | | $580 | |
| | | REECE, LARRY | $895 | | | $895 | |
| | | RELIZON COMPANY, THE dba Workflowone | $3,385 | | | $3,385 | |
| | | RESTORATION BY COSTIKYAN LTD. | $911 | | | $911 | |
| | | RHODERICK, MICHAEL F. | $493 | | | $493 | |
| | | RICOH PRINTING SYSTEMS AMERICA dba Ricoh | $785 | | | $785 | |
| | | Riemer Floors | $212 | 60 | $6,312 | $6,312 | |
| | | RIETER CORPORATION | $2,095 | | | $2,095 | |
| | | Ronile, Inc. | $7,054,927 | 130 | $3,321,721 | $3,321,721 | |
| | | Ronile, Inc. | $0 | 131 | $5,150,000 | $5,150,000 | |
| | | Ronile, Inc. | $0 | 132 | $3,832,569 | $3,832,569 | |
| | | Ronile, Inc. | $11,180,993 | 133 | | $10,000,000 | |
| | | S & F CERTIFIED INSPECTIONS | $190 | | | $190 | |
| | | SAIDEL, JONATHAN D. | $1,016 | | | $1,016 | |
| | | SANDHILL SIGNS | $418 | | | $418 | |
| | | SAWYER, GARY | $247 | | | $247 | |
| | | Schoch Tile and Carpet Co. | $2,629 | | | $2,629 | |
| | | SERVICE SOURCE UNLIMITED | $1,888 | | | $1,888 | |
| | | Sharon Furniture dba Towne Carpet | $0 | 141 | $4,318 | $0 | claim objection pending |
| | | SID TOOL CO. INC. dba Mscindustrial Supp | $917 | | | $917 | |
| | | SILVER, SAMUEL PHILIP | $226 | | | $226 | |
| | | Simatex, Inc. | $32,349 | 44 | $35,646 | $35,646 | |
| | | SKOLNICK, BARRY | $435 | | | $435 | |
| | | SLADE INC. | $329 | | | $329 | |
| | | SMITH LEONARD PLLC | $33,766 | | | $33,766 | |
| | | SOUTHEASTERN FREIGHT LINES | $40,300 | | | $40,300 | |
| | | SOUTHERN MOTOR PARTS INC | $1,251 | | | $1,251 | |
| | | SPRINT SPECTRUM L.P. | $950 | | | $950 | |
| | | Sterling Carpet | $2,032 | | | $2,032 | |
| | | STETZ JR., ED | $244 | | | $244 | |
| | | Steven Dugalic Wallpaper Co. | $0 | 142 | $1,328 | $0 | claim objection pending |
| | | SUMMER INDUSTRIES LLC | $22,492 | | | $22,492 | |
| | | SUMMIT PACKAGING INC. dba Blackstock Sal | $13,994 | | | $13,994 | |
| | | Superfloors Inc. | $12 | | | $12 | |
| | | Superior Swatching Service, Inc. | $33,932 | 66 | $34,403 | $34,403 | |

| Class | Type | Creditor | Scheduled Amount | Claim No. | Filed Amount | Est. Allowed Amount | Comments |
|---|---|---|---|---|---|---|---|
| | | SURHIGH, ROBERT | $116 | | | $116 | |
| | | SWAN, SCOTT P. | $537 | | | $537 | |
| | | SwissTex America, Inc. | $2,861 | 59 | $2,861 | $2,861 | |
| | | Tappatec, Inc. | $5,671 | | | $5,671 | |
| | | TENCARVA MACHINERY COMPANY | $895 | | | $895 | |
| | | TESTING SERVICES INC. | $720 | | | $720 | |
| | | Texoma Medical Center | $0 | 2 | $4,709 | $4,709 | |
| | | TEXPAK INC | $380 | | | $380 | |
| | | Textile & Industrial Sales, Inc. | $901 | 40 | $901 | $901 | |
| | | THARPE COMPANY INC., THE | $2,482 | | | $2,482 | |
| | | The Carpet Shop Inc dba Carpet Country | $505 | | | $505 | |
| | | The Carpet Shoppe | $3,299 | | | $3,299 | |
| | | THYSSENKRUPP ELEVATOR | $1,808 | | | $1,808 | |
| | | Tile and Carpet World | $0 | 64 | $666 | $666 | |
| | | TK Carpet | $665 | | | $665 | |
| | | Traffic Management Services, Inc. | $3,765 | 17 | $1,194 | $3,765 | |
| | | TRANSWORLD SYSTEMS INC. | $920 | | | $920 | |
| | | Tri City Carpet 1 Inc. | $68 | | | $68 | |
| | | TRI COM INDUSTRIAL | $12,021 | | | $12,021 | |
| | | TUFTING MACHINE CO INC | $4,008 | | | $4,008 | |
| | | TURNER, GREG | $192 | | | $192 | |
| | | Tyco Integrated Security | $0 | 134 | $6,736 | $0 | claim objection pending |
| | | U.S. SECURITY ASSOCIATES INC | $10,196 | | | $10,196 | |
| | | UNDERFOOT INSPECTIONS INC. | $750 | | | $750 | |
| | | Unicom Systems, Inc. | $0 | | | $0 | |
| | | UNICORN HRO LLC | $25,560 | | | $25,560 | |
| | | UNITED PARCEL SERVICE | $26 | | | $26 | |
| | | VALDESE WEAVERS LLC | $4,682 | | | $4,682 | |
| | | VAUGHN, DAMITA dba Custom Floor Designs | $189 | | | $189 | |
| | | VENDOR TEAM SERVICES INC. | $2,250 | | | $2,250 | |
| | | VERIZON WIRELESS SERVICES LLC | $671 | | | $671 | |
| | | VORPAHL, JERRY | $184 | | | $184 | |
| | | W.W. GRAINGER INC. | $1,962 | | | $1,962 | |
| | | Wade Carpet | $418 | | | $418 | |
| | | WARNER'S ELECTRIC MOTOR & AUTO SHOP | $65 | | | $65 | |
| | | Waste Management | $20 | 119 | $1,071 | $1,071 | |
| | | Watkins & Shepard Trucking, Inc. | $28,939 | 25 | $31,936 | $31,936 | |
| | | WEBCO UNLIMITED INC. | $377 | | | $377 | |
| | | WELCHER, JOHN | $430 | | | $430 | |
| | | Westpoint Home, LLC | $320,875 | 129 | $2,539,205 | $356,512 | settlement motion pending |
| | | Where 2 Get It, Inc. | $8,000 | 41 | $8,000 | $0 | claim objection pending |
| | | White Lamb Finlay, Inc. | $10,325 | 19 | $10,325 | $10,325 | |
| | | Williams Specialty Company, Inc. | $109 | 33 | $109 | $109 | |
| | | WILSON, JOHN | $774 | | | $774 | |
| | | WorkflowOne LLC | $0 | 4 | $8,348 | $8,348 | |
| | | WRIGHT OF THOMASVILLE INC. | $658 | | | $658 | |
| | | WW Grainger, Inc. | $0 | 23 | $2,095 | $2,095 | |
| | | Xerox Corporation | $927 | 111 | $927 | $927 | |
| | | Xpress Global Systems, Inc. | $180,688 | 74 | $246,130 | $246,130 | |
| | | ZAWACKI, RICHARD | $119 | | | $119 | |
| | | **503(b)(9) claims** | | | | $40,769 | objections to § 503(b)(9) claims pending |
| **Total Estimated Unsecured Claims** | | | | | | **$30,609,970** | |
| | | Ronile Unsecured | | | | $22,304,290 | |
| | | Other Unsecured | | | | $8,305,680 | |

**Projected Chapter 11 Recovery and Chapter 7 Liquidation Analysis for Hampton Capital Partners, LLC**

| | Chapter 11 | |
|---|---|---|
| **Assets** | **Low recovery** | **High recovery** |
| Cash on deposit 9/16/13 (includes proceeds from Personal Property) | $ 1,995,135 | $ 1,995,135 |
| Cash - Net Proceeds from sale of Aberdeen Facility | $ 1,510,495 | $ 1,509,957 |
| Wagram Facility (est. net proceeds) | $ 50,000 | $ 500,000 |
| Debtor's Professional Fee Reserve | $ 11,005 | $ 11,005 |
| Escrow for Ronile Heatsetter | $ 37,500 | $ 37,500 |
| Intellectual Property and related assets | $ 100,000 | $ 100,000 |
| Accounts Receivable | $ 250,000 | $ 750,000 |
| Unused Utilities Deposits | | $ 325,250 |
| Recovery from Avoidance Actions | $ 400,000 | $ 670,000 |
| **Total Assets** | **$ 4,354,135** | **$ 5,898,847** |

| **Chapter 7 Administrative Claims** | **High costs** | **Low costs** |
|---|---|---|
| Court fees (AP) | $ - | $ - |
| Chapter 7 Trustee Fees-commission based on disbursements | $ - | $ - |
| Chapter 7 Trustee Professionals | $ - | $ - |
| **Total Chapter 7 Administrative Claims** | $ - | $ - |

| **Chapter 11 Administrative Claims** | **High costs** | **Low costs** |
|---|---|---|
| Court fees (AP) | $ (5,000) | $ (2,000) |
| Court fees (est., based on disbursements) | $ (10,400) | $ (13,000) |
| Debtor's Professionals (accrued and est.) | $ (200,000) | $ (150,000) |
| Committee's Professionals (accrued and est.) | $ (250,000) | $ (190,000) |
| 11 U.S.C. § 503(b)(9) claims (est., disputed in part) | $ (68,979) | $ (22,231) |
| Ohio Dept of Taxation (disputed) | $ (10,000) | $ - |
| Dixie Group, Inc. admin claim | $ (44,179) | $ (44,179) |
| Chapter 11 Trustee Fees | $ (150,000) | $ (50,000) |
| Chapter 11 Trustee Professionals (est.) | $ (300,000) | $ (150,000) |
| **Total Chapter 11 Administrative Claims** | **$ (1,038,558)** | **$ (621,410)** |
| **Net proceeds available to creditors** | **$ 3,315,577** | **$ 5,277,437** |

| **Projected Distributions** | **Low Distribution** | **High Distribution** |
|---|---|---|
| Priority Tax Claims | $ 34,423 | $ 34,423 |
| Class 1 - Ronile Secured Claims | $ 1,559,957 | $ 2,009,957 |
| Class 2 - Scotland County Tax Collector | $ 75,222 | $ 75,222 |
| Class 3 - Priority Benefit Claims | $ 292,281 | $ 886,711 |
| Class 4 - Ronile Unsecured Claims | $ - | $ 742,429 |
| Class 5 - Unsecured Claims* | $ 1,353,695 | $ 1,528,695 |

| **Estimated Percentage Recovery for Class 5** | **16.30%** | **18.41%** |
|---|---|---|

*Projected distributions are based on estimated Class 5 Claims being paid 15% of the estimated total amount of unsecured claims, $8,305,680 (this does not included the Ronile Unsecured Claims), and their share of the Avoidance Action Net Proceeds, which are estimated by the Debtor to be between $100,000 to $275,000.

| | Chapter 7 | | | |
|---|---|---|---|---|
| **Assets** | **Low recovery** | | **High recovery** | |
| Cash on deposit 9/16/13 (includes proceeds from Personal Property) | $ | 1,995,135 | $ | 1,995,135 |
| Cash - Net Proceeds from sale of Aberdeen Facility | $ | 1,510,495 | $ | 1,509,957 |
| Wagram Facility (est. net proceeds) | $ | 50,000 | $ | 500,000 |
| Debtor's Professional Fee Reserve | $ | 11,005 | $ | 11,005 |
| Escrow for Ronile Heatsetter | $ | - | $ | 75,000 |
| Intellectual Property and related assets | $ | 100,000 | $ | 100,000 |
| Accounts Receivable | $ | 187,500 | $ | 562,500 |
| Unused Utilities Deposits | $ | - | $ | 325,250 |
| Recovery from Avoidance Actions | $ | 360,000 | $ | 603,000 |
| **Total Assets** | **$** | **4,214,135** | **$** | **5,681,847** |
| | | | | |
| **Chapter 7 Administrative Claims** | **High costs** | | **Low costs** | |
| Court fees (AP) | $ | (5,000) | $ | (2,000) |
| Chapter 7 Trustee Fees-commission based on disbursements | $ | (165,858) | $ | (138,874) |
| Chapter 7 Trustee Professionals | $ | (400,000) | $ | (200,000) |
| **Total Chapter 7 Administrative Claims** | $ | (570,858) | $ | (340,874) |
| | | | | |
| **Chapter 11 Administrative Claims** | **High costs** | | **Low costs** | |
| Court fees (AP) | $ | - | $ | - |
| Court fees (est., based on disbursements) | $ | - | $ | - |
| Debtor's Professionals (accrued and est.) | $ | (200,000) | $ | (150,000) |
| Committee's Professionals (accrued and est.) | $ | (250,000) | $ | (190,000) |
| 11 U.S.C. § 503(b)(9) claims (est., disputed in part) | $ | (68,979) | $ | (22,231) |
| Ohio Dept of Taxation (disputed) | $ | (10,000) | $ | - |
| Dixie Group, Inc. admin claim | $ | (44,179) | $ | (44,179) |
| Chapter 11 Trustee Fees | | | | |
| Chapter 11 Trustee Professionals (est.) | | | | |
| **Total Chapter 11 Administrative Claims** | $ | (573,158) | $ | (406,410) |
| | | | | |
| **Net proceeds available to creditors** | **$** | **3,599,098** | **$** | **4,934,563** |
| | | | | |
| **Projected Distributions** | **Low Distribution** | | **High Distribution** | |
| Priority Tax Claims | $ | 34,423 | $ | 34,423 |
| Class 1 - Ronile Secured Claims | $ | 1,559,957 | $ | 2,009,957 |
| Class 2 - Scotland County Tax Collector | $ | 75,222 | $ | 75,222 |
| Class 3 - Priority Benefit Claims | $ | 886,711 | $ | 886,711 |
| Unsecured Claims (Classes 4 and 5) | $ | 1,042,786 | $ | 1,928,250 |
| Total Unsecured Claims | $ | 30,609,970 | $ | 30,609,970 |
| | | | | |
| **Estimated Percentage Recovery for Unsecured Claims** | **3.41%** | | **6.30%** | |